UNITED STATES of America

v.

ALCAN ALUMINUM CORP., BASF Corp.; Beazer Materials and Services, Inc.; Borg–Warner Corp.; Carrier Corp.; Chemical Leaman Tank Lines, Inc.; Chemical Management, Inc.; Chrysler Motors Corp.; Dana Corp.; Dart Industries, Inc.; Exxon Corp.; Ford Motor Company; Goulds Pumps, Inc.; Hitchcock Gas Engine Company, Inc.; Ingersoll–Rand; Neapco, Inc.; Rome Strip Steel Co., Inc.; the Stanley Works, Inc.; TRW, Inc.; United Technologies Chemical Management, Inc., Counter-claimant.

CHEMICAL MANAGEMENT, INC. Cross-claimant,

v.

UNITED STATES of America Counter-defendant,

Alcan Aluminum Corp.; BASF Corp.; Beazer Materials and Services, Inc.; Borg–Warner Corp.; Carrier Corp.; Chemical Leaman Tank Lines, Inc.; Chrysler Motors Corp.; Dana Corp.; Dart Industries, Inc.; Exxon Corp.; Ford Motor Company; Goulds Pumps, Inc.; Hitchcock Gas Engine Company, Inc.; Ingersoll–Rand; Neapco, Inc.; Rome Strip Steel Co., Inc.; the Stanley Works, Inc.; TRW, Inc.

UNITED TECHNOLOGIES; Cross-defendants,

Neapco, Inc.; Counter-claimant.

Neapco, Inc.; Cross-claimant,

v.

UNITED STATES of America Counter-defendant,

Alcan Aluminum Corp.; Basf Corp.; Beazer Materials and Services, Inc.; Borg–Warner Corp.; Carrier Corp.; Chemical Leaman Tank Lines, Inc.; Chemical Management, Inc.; Chrysler Motors Corp.; Dana Corp.; Dart Indus-

tries, Inc.; Exxon Corp.; Ford Motor Company; Goulds Pumps, Inc.; Hitchcock Gas Engine Company, Inc.; Ingersoll–Rand; Rome Strip Steel Co.; Inc.; the Stanley Works, Inc.; TRW, Inc.; United Technologies Cross-defendants,

**Alcan Aluminum Corporation Appellant.**

No. 91–5481.

United States Court of Appeals, Third Circuit.

Argued April 6, 1992.

Decided May 14, 1992.

Rehearing and Rehearing In Banc Denied July 27, 1992.

Lawrence A. Salibra, II (argued), Cleveland, Ohio, for appellant Alcan Aluminum Corp.

Barry M. Hartman, Acting Asst. Atty. Gen., Michael D. McIntyre, J. Carol Williams, Elizabeth Ann Peterson, John T. Stahr (argued), Attys., U.S. Dept. of Justice, Washington, D.C., for appellee U.S.

Norman W. Bernstein (argued), David L. Anderson, Laurel A. Bedig, Shea & Gould, Washington, D.C., for appellees BASF Corp., Beazer Materials and Services, Inc., Exxon Corp., and Ford Motor Co.

Stuart W. Axe, Lester, Schwab, Katz & Dwyer, New York City, for appellee Chrysler Motors Corp.

John B. Lewis, Arter & Hadden, Cleveland, Ohio, for amici curiae Operation Oswego County, Inc., County of Oswego, Greater Oswego Chamber of Commerce, Inc., City of Oswego, Mohawk Cent. School Dist., Richfield Springs Cent. School Dist., Mount Markham Cent. School Dist., and New Hartford Cent. School Dist.

Hosmer Culkin, Operation Oswego County, Inc., Oswego, N.Y., for amicus curiae Operation Oswego County, Inc.

Bruce N. Clark, Oswego, N.Y., for amicus curiae County of Oswego.

Michael Stanley, Oswego, N.Y., for amicus curiae Greater Oswego Chamber of Commerce, Inc.

Gay Williams, Sullivan & Williams, Oswego, N.Y., for amicus curiae City of Oswego.

Alan S. Burstein, Scolaro, Shulman, Cohen, Lawler & Burstein, Syracuse, N.Y., for amici curiae Mohawk Cent. School Dist., Richfield Springs Cent. School Dist., Mount Markham Cent. School Dist., and New Hartford Cent. School Dist.

James R. Griffith, Felt, Hubbard, & Bogan, Utica, N.Y., for amici curiae Russell Blackstone, Feminine Touch Fabrics, Clinton Auto Ser., True Value Hardware, Brandy Keg Kennels, and Herkimer Elks Club.

Constantine L. Trela, Laura L. Leonard, Carolyn K. Gerwin, Sidley & Austin, Chicago, Ill., Robin S. Conrad, National Chamber Litigation Center, Inc., Washington, D.C., for amicus curiae U.S. Chamber of Commerce.

Before: GREENBERG and SCIRICA, Circuit Judges, and DEBEVOISE, District Judge.*

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

This matter is before the court on appeal by Alcan Aluminum Corporation ("Alcan") from a summary judgment entered in favor of the United States (the "Government") for response costs incurred by the Government in cleaning the Susquehanna River.

On November 24, 1989, the Government filed a complaint in the United States District Court for the Middle District of Pennsylvania under section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(a) ("CERCLA") against 20 defendants, including Alcan, for the recovery of clean-up costs it incurred in response to a release of hazardous substances into the Susquehanna River. On October 11, 1990, the Government moved for summary judgment against Alcan, the only non-settling defendant, and on November 13, 1990, Alcan cross-moved for summary judgment.

The district court, after receiving a report and recommendation from a magistrate judge, issued a memorandum and order granting the Government's motion for the reasons set forth in *United States v. Alcan Aluminum Corp.*, 755 F.Supp. 531 (N.D.N.Y.1991) (hereinafter called *"Alcan New York"*), another CERCLA case involving the release of hazardous substances generated by Alcan but at a different location. Accordingly, on May 8, 1991, the court entered judgment against Alcan in the amount of $473,790.18, which was the difference between the full response costs the Government had incurred in cleaning the Susquehanna River and the amount the Government had recovered from the settling defendants.

For reasons that follow, even though we largely agree with the district court's interpretation of the relevant provisions of CERCLA, we will vacate the judgment of May 8, 1991, and will remand the case for further factual development concerning the scope of Alcan's liability.

## I.

## FACTS AND PROCEDURAL HISTORY

Virtually all of the facts in this case to the extent developed at this point are undisputed. The Butler Tunnel Site (the "Site") is listed on the National Priorities List established by the Environmental Protection Agency ("EPA") under section 105 of CERCLA, 42 U.S.C. § 9605. *See* 52 Fed.Reg. 27,620 (July 22, 1987). The Site includes a network of approximately five square miles of deep underground mines and related tunnels, caverns, pools and waterways bordering the east bank of the Susquehanna River in Pittston, Pennsylvania. The mine workings at the Site are drained by the Butler Tunnel (the "Tunnel"), a 7500 foot tunnel which feeds directly into the Susquehanna River.

* Honorable Dickinson R. Debevoise, United States District Judge for the District of New Jersey, sitting by designation.

The mines are accessible from the surface by numerous air shafts or boreholes. One borehole (the "Borehole") is located on the premises of Hi–Way Auto Service, an automobile fuel and repair station situated above the Tunnel. The Borehole leads directly into the mine workings at the Site.

In the late 1970's, the owner of Hi–Way Auto Service permitted various liquid waste transport companies, including those owned and controlled by Russell Mahler (the "Mahler Companies"), to deposit oily liquid wastes containing hazardous substances into the Borehole.[1] The Mahler Companies collected the liquid wastes from numerous industrial facilities located in the northeastern United States and, in total, disposed of approximately 2,000,000 gallons of oily wastes containing hazardous substances through the Borehole.[2] Apparently, it was contemplated that the waste would remain at the Site indefinitely.

Alcan is an Ohio corporation which manufactures aluminum sheet and plate products in Oswego, New York. From 1965 through at least 1989, Alcan's manufacturing process involved the hot-rolling of aluminum ingots. To keep the rolls cool and lubricated during the hot-rolling process, Alcan circulated an emulsion through the rolls, consisting of 95% deionized water and 5% mineral oil. At the end of the hot-rolling process, Alcan removed the used emulsion and replaced it with unused emulsion.

During the rolling process, fragments of the aluminum ingots, which also contained copper, chromium, cadmium, lead and zinc, hazardous substances under CERCLA, broke off into the emulsion. In an effort to remove those fragments, Alcan then filtered the used emulsion prior to disposing

of it, but the filtering process was imperfect and hence some fragments remained. According to Alcan, however, the level of these compounds in the post-filtered, used emulsion was "far below the EP toxic or TCLP toxic levels and, indeed, orders of magnitude below ambient or naturally occurring background levels. Moreover, the trace quantities of metal compounds in the emulsion [were] immobile...." Appellant's Br. at 4. The Government does not specifically challenge Alcan's assertion that the used emulsion contained only low levels of these metallic compounds, as it contends that this fact is irrelevant to Alcan's liability under CERCLA.

From mid–1978 to late 1979, Alcan contracted with the Mahler Companies to dispose of at least 2,300,950 gallons of used emulsion from its Oswego, New York, facility. During that period, the Mahler Companies disposed of approximately 32,500–37,500 gallons (or five 6500–7500 gallon loads) of Alcan's liquid waste through the Borehole into the Site.[3]

In September 1985, approximately 100,000 gallons of water contaminated with hazardous substances were released from the Site into the Susquehanna River. It appears that this discharge was composed of the wastes deposited into the Borehole in the late 1970's. Between September 28, 1985, and January 7, 1987, EPA incurred significant response costs due to the release and the threatened release of hazardous substances from the Site. According to the Government, EPA's response actions included "containing an oily material on the river through the use of absorbent booms; immediately removing and disposing of 161,000 pounds (over 80 tons) of oil and chemical-soaked debris and soil, monitoring, sampling and analysis of air and wa-

1. The Mahler Companies are said to be government-licensed waste processors. *Amicus Curiae* the United States Chamber of Commerce Br. at 6.

2. On occasion, the Mahler Companies commingled Alcan's oily waste with other waste at Mahler's recycling facilities located in Syracuse, New York, and Edgewater, New Jersey, before disposing of the waste through the Borehole.

3. Although Alcan has argued that the Government did not prove that its emulsion was actual-

ly at the Site because it did not establish the presence of chromium, this does not preclude Alcan's liability under CERCLA, for even assuming *arguendo* that there was no chromium at the Site, Alcan has admitted that "the Mahler companies disposed of ... the Alcan emulsion through the Borehole into the Site." App. at 36. Alcan asserts that it was not aware that Mahler was disposing of the oily waste in this fashion, but the Government does not contend otherwise, and in any event Alcan does not contend that this should affect our result.

ter, and conducting hydrogeologic studies." Government's Br. at 10–11.

On December 27, 1985, EPA issued written information requests to potentially responsible parties ("PRPs"),[4] including Alcan, concerning their responsibility for the presence of hazardous substances at the Site. In May and June of 1986, EPA issued letters to the PRPs informing them of their potential liability under CERCLA. Those letters invited the PRPs to conduct a remedial investigation/feasibility study and to enter into an agreement with EPA for the issuance of an administrative order governing the study. Several PRPs conducted these negotiations with EPA in an attempt to settle their liability for removal costs incurred by the Government, but Alcan did not participate in this process.

In November 1989, the Government filed a complaint against 20 defendants, including Alcan, for the recovery of costs incurred as a result of the release of hazardous wastes from the Site into the Susquehanna River. In response, 17 of the 20 defendants executed a consent decree, reimbursing the Government for certain removal costs, and the district court entered that decree on January 17, 1990. On June 8, 1990, two of the three remaining defendants entered into a second consent decree with the Government, which the district court approved on July 25, 1990.

The Government then moved for summary judgment against Alcan, the only non-settling defendant, to collect the balance of its response costs. Alcan crossmoved for summary judgment, arguing that its emulsion did not constitute a "hazardous substance" as defined by CERCLA due to its below-ambient levels of copper, cadmium, chromium, lead and zinc, and further contending that its emulsion could not have caused the release or any response costs incurred by the Government.

On January 9, 1991, the district court referred this case to a magistrate judge who recommended that the court grant the Government's motion for summary judgment for the reasons set forth by the United States District Court for the Northern District of New York in *Alcan New York*. On the basis of that recommendation, the district court granted the Government's motion for summary judgment on May 8, 1991. Accordingly, it held that Alcan was jointly and severally liable for the removal costs because Alcan's waste contained identifiable levels of hazardous substances and was present at the Site from which there was a release. By following *Alcan New York*, the court also concluded that Alcan's waste did not fall within the "petroleum exclusion" under 42 U.S.C. § 9601(14).

Alcan filed a timely notice of appeal on June 5, 1991, and we have jurisdiction to review the district court's final order pursuant to 28 U.S.C. § 1291. Our standard of review is plenary. *Carlson v. Arnot–Ogden Memorial Hospital*, 918 F.2d 411, 413 (3d Cir.1990).

## II.

## DISCUSSION

### A. CERCLA FRAMEWORK:

■ In response to widespread concern over the improper disposal of hazardous

---

**4.** Under 42 U.S.C. § 9607(a), "responsible parties" include:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, *from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance. . . .*

(emphasis supplied).

As courts have observed, Congress intended that the underscored language relate not only to § 9607(a)(4), but also to § 9607(a)(1)–(3), but apparently misdrafted the language. *See, e.g., Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1151 n. 4 (1st Cir.1989); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 n. 16 (2d Cir.1985).

wastes, Congress enacted CERCLA, a complex piece of legislation designed to force polluters to pay for costs associated with remedying their pollution. *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980*, Senate Committee of Environment and Public Works (*"A Legislative History"*), S.Doc. No. 97–14, 97th Cong., 2d Sess.1983, Vol. I, p. 320 (one of the statute's principal goals is "assuring that those who caused chemical harm bear the costs of that harm. . . .") As numerous courts have observed, CERCLA is a remedial statute which should be construed liberally to effectuate its goals. *See, e.g., B.F. Goodrich v. Murtha*, 958 F.2d 1192, 1197 (2d Cir.1992) ("In CERCLA Congress enacted a broad remedial statute designed to enhance the authority of the EPA to respond effectively and promptly to toxic pollutant spills that threaten[ ] the environment and human health."); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir.1989) (CERCLA is a "broad response and reimbursement statute").[5]

CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (Oct. 17, 1986), grants broad authority to the executive branch of the federal government to provide for the clean-up of hazardous substance sites. Specifically, section 104 authorizes the President to respond to a release or substantial threat of a release of hazardous substances into the environment by: (1) removing or arranging for the removal of hazardous substances; (2) providing for remedial action relating to such hazardous substances; and (3) taking any other response measure consistent with the National Contingency Plan that the President deems necessary to protect the public health or welfare or the environment. 42 U.S.C. § 9604(a). The President has delegated most of his authority under CERCLA to EPA.[6]

CERCLA's bite lies in its requirement that responsible parties pay for actions undertaken pursuant to section 104. Under section 107, CERCLA liability is imposed where the plaintiff establishes the following four elements:

(1) the defendant falls within one of the four categories of "responsible parties";[7]

(2) the hazardous substances are disposed at a "facility";[8]

(3) there is a "release" or threatened release of hazardous substances from the facility into the environment;[9]

---

**5.** Unfortunately, CERCLA was passed in great haste during the waning days of the 96th Congress. As a result, the statute is riddled with inconsistencies and redundancies. *See A Legislative History*, Vol. I, pp. 785–87.

**6.** *See, e.g.,* Exec. Order No. 12,580 (January 23, 1987).

**7.** *See supra* n. 4.

**8.** A facility is defined as:
any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.
42 U.S.C. § 9601(a).
The parties have agreed that the Site is a "facility" within the meaning of CERCLA.

**9.** A release is defined as:
any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine, (C) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954 [42 U.S.C. § 2011 et seq.] if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act [42 U.S.C. § 2210], or, for the purposes of section 9604 of this title or any other response action, any release of source byproduct, or special nuclear material from any pro-

(4) the release causes the incurrence of "response costs".[10]

42 U.S.C. § 9607. *See also B.F. Goodrich,* at 1198; *United States v. Serafini,* 750 F.Supp. 168, 170 (M.D.Pa.1990); *United States v. Wade,* 577 F.Supp. 1326, 1333 (E.D.Pa.1983).

Reimbursement for response costs can be obtained in a variety of ways. For example, the Government can clean the sites itself using monies in the Hazardous Substance Response Trust Fund established by section 221 of CERCLA, 42 U.S.C. § 9631 and now the Hazardous Substance Superfund or "Superfund" (*see* 26 U.S.C. § 9507); EPA can then seek reimbursement from responsible parties, as it has done in this case. In addition, section 106(a) permits EPA to request the Attorney General to "secure such relief as may be necessary to abate such danger or threat" by filing a civil action in federal district court. That section also permits EPA to issue administrative orders "as may be necessary to protect public health and welfare and the environment."

Finally, and of great significance in this case, CERCLA imposes strict liability on responsible parties. 42 U.S.C. § 9601(32).[11] *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d at 1150; *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir.1985) ("Congress intended that responsible parties be held strictly liable, even though an explicit provision for strict liability was not included in the compromise....")

## B. CERCLA CONTAINS NO QUANTITATIVE REQUIREMENT IN ITS DEFINITION OF "HAZARDOUS SUBSTANCE":

■ Alcan argues that it should not be held liable for response costs incurred by the Government in cleaning the Susquehanna River because the level of hazardous substances in its emulsion was below that which naturally occurs and thus could not have contributed to the environmental injury. It asserts that we must read a threshold concentration requirement into the definition of "hazardous substances" for the term "hazardous" to have any meaning. The United States Chamber of Commerce (the "Chamber") as *amicus curiae* agrees, observing that "Congress took pains to define 'hazardous substance'.... Congress clearly never intended to abandon altogether the requirement that the substance at issue be hazardous." Chamber Br. at 20–21 (footnote omitted). The Chamber further states that "the uncontested facts show that Alcan's waste contained less of these [hazardous] elements than can be found in clean dirt." Chamber Br. at 18. For these reasons it too claims that Alcan should not be held liable for any environmental injury to the Susquehanna River.

The Government responds that under a plain reading of the statute, there is no quantitative requirement in the definition of "hazardous substance." Therefore, the Government asserts that Alcan's argument that substances containing below-ambient levels of hazardous substances are not really "hazardous" is properly directed at Congress, not the judiciary.

By adopting the reasoning of *Alcan New York,* the district court in this case agreed with the Government. Quoting *Amoco Oil*

cessing site designated under section 7912(a)(1) or 7942(a) of this title, and (D) the normal application of fertilizer.
42 U.S.C. § 9601.
The parties in this suit have also agreed that a "release" has occurred.

**10.** Section 9601 provides that the terms "respond" and "response" mean "remove, removal, remedy, and remedial action, all such terms (including the terms 'removal' and 'remedial action') include enforcement actions related thereto." Typically, a "removal" action is an

action intended to remove the hazardous waste from the area, whereas a "remedial" action involves a long-term effort to remedy the damaged environment. *See* Government's Br. at 4 n. 4.

**11.** That section provides that CERCLA liability "shall be construed to be the standard of liability" under section 311 of the Clean Water Act, 33 U.S.C. § 1321; section 1321 liability is strict. *See, e.g., Steuart Transportation Co. v. Allied Towing Corp.,* 596 F.2d 609, 613 (4th Cir.1979).

*Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir.1989), the district court in *Alcan New York* observed, " 'the plain statutory language fails to impose any quantitative requirement on the term hazardous substance,' " 755 F.Supp. at 537, and concluded that "there is no principled basis upon which to deviate from the ... rule that the mere listing of a substance by EPA renders that substance hazardous." *Id.* at 537–38. In response to Alcan's argument that virtually everything in the universe would constitute a hazardous substance under this reading of the statute, the court in *Alcan New York* held:

> [T]he corporate generator, a non-natural person, has added to what nature has already seen fit to provide for the continued existence of various life forms on this planet; that Congress has enacted laws to limit, and perhaps limit quite severely, additions to nature for the sake of the environment and of life on this planet seems eminently reasonable.

*Id.* at 538.

For the reasons that follow, we are satisfied that the court was correct in that conclusion.

### 1. Plain Meaning:

Section 9601(14) sets forth CERCLA's definition of "hazardous substance" as:

> 'hazardous substance' means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently

hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph....

Hence, the statute does not, on its face, impose any quantitative requirement or concentration level on the definition of "hazardous substances." Rather, the substance under consideration must simply fall within one of the designated categories.

### 2. Legislative History:

Since the statute is plain on its face, we need not resort to legislative history to uncover its meaning. *Sacred Heart Medical Center v. Sullivan*, 958 F.2d 537, 545 (3d Cir.1992); *Velis v. Kardanis*, 949 F.2d 78, 81 (3d Cir.1991). In any event, the legislative history is barren of any remarks directly revealing Congress' intent vis-a-vis a threshold requirement on the definition of hazardous substances. Significantly, however, the available legislative history of CERCLA *does* indicate that Congress created the statute to force all polluters to pay for their pollution. *A Legislative History*, Vol. I, p. 320. It is difficult to imagine that Congress intended to impose a quantitative requirement on the definition of hazardous substances and thereby permit a polluter to add to the total pollution but avoid liability because the amount of its own pollution was minimal.

### 3. Jurisprudence:

In addition, courts that have addressed this issue have almost uniformly held that CERCLA liability does not depend on the existence of a threshold quantity of a hazardous substance. *See, e.g., Amoco Oil Co. v. Borden, Inc.*, 889 F.2d at 669 ("The plain statutory language fails to impose any quantitative requirement on the term hazardous substance and we decline to imply that any is necessary.");[12] *Eagle–Pich-*

---

**12.** As we discuss below, the court of appeals in *Amoco* effectively built back into the statute a threshold requirement under the causation prong of liability in the single-generator context.

*er Industries, Inc. v. United States EPA,* 759 F.2d 922, 927 (D.C.Cir.1985) ("a substance is a 'hazardous substance' within the meaning of CERCLA if it qualifies under *any* of the several subparagraphs of section 101(14)") (emphasis in original); *City of New York v. Exxon Corp.,* 744 F.Supp. 474, 483 (S.D.N.Y.1990) ("liability under CERCLA attaches regardless of the concentration of the hazardous substances present in a defendant's waste so long as the defendant's waste and/or the contaminants in it are 'listed hazardous substances'...."); *United States v. Western Processing Co.,* 734 F.Supp. 930, 936 (W.D.Wash.1990) ("The concentration or amount of hazardous substance is irrelevant as the statutory definition contains no threshold requirement."); *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 238 (W.D.Mo.1985) ("A waste is a 'hazardous substance' under CERCLA if it contains substances listed as hazardous under any of the statutes referenced in CERCLA section 101(14) regardless of the volumes or concentration of those substances; presumably, if Congress intended the definition of hazardous substances to be contingent upon the presence of a certain amount or concentration of a hazardous substance, it would have so provided."); *United States v. Carolawn Co.,* 21 Envt.Rep.CCas. (BNA) 2124, 2126 (D.S.C.1984) (CERCLA "simply does not distinguish hazardous substances on the basis of quantity of concentration") (footnote omitted); *United States v. Wade,* 577 F.Supp. 1326, 1340 (E.D.Pa.1983) (CERCLA imposes no concentration requirement on the definition of hazardous substances). *But see United*

*States v. Ottati & Goss, Inc.,* 22 E.R.C. 1736, 1739 (D.N.H.1984) (granting defendant's motion to dismiss on the ground that it "did not cause or contribute to cause the disposal of any hazardous wastes ... which *exceeded the threshold established by the EPA for hazardous wastes*") (emphasis supplied).

4. Congressional Matter:

It may be that Congress did not intend such an all-encompassing definition of "hazardous substances," but this argument is best directed at Congress itself. If Congress had intended to impose a threshold requirement, it could easily have so indicated. We should not rewrite the statute simply because the definition of one of its terms is broad in scope.[13]

C. THE DISTRICT COURT'S DEFINITION OF "HAZARDOUS SUBSTANCE" IS NOT INCONSISTENT WITH EPA REGULATIONS AND POLICY:

1. RQs and CASRNs

█ Alcan asserts that the district court's decision is erroneous because it bases Alcan's liability on the ground that the used emulsion contains trace levels of certain generic compounds listed in 40 C.F.R. § 302.4, Table 302.4, which is a consolidation of the lists promulgated pursuant to the Clean Water Act, the Clean Air Act and the Resource Conservation and Recovery Act.[14] According to Alcan, substances listed under Table 302.4 must have reportable quantities ("RQs")[15] and Chemical Ab-

---

**13.** EPA's statement that it does not consider a waste to be "hazardous" for purposes of the Resource Conservation and Recovery Act ("RCRA") unless that waste exists in a form "capable of causing substantial harm if mismanaged," 57 Fed.Reg. 1, 12 (January 2, 1992), does not alter our conclusion. As we discuss *infra* at n. 19, RCRA's goals differ from CERCLA's, and we do not construe EPA's comments as indicating that the Agency also imputes a threshold concentration requirement into the definition of hazardous substance under section 101(14) of CERCLA, especially in the face of plain statutory language indicating otherwise.

There is some force to Alcan's argument that this definition of "hazardous substances" is so

broad that it encompasses virtually everything and thereby eviscerates the meaning of "hazardous." However, our holding with respect to divisibility of harm as discussed below should assuage Alcan's fear that liability under CERCLA will be as far-reaching as the definition of hazardous substances.

**14.** We agree with the district court in *Alcan New York* regarding the origin of the table.

**15.** "Reportable quantity" is defined in EPA's regulations as "that quantity, as set forth in this part, the release of which requires notification pursuant to this part." 40 C.F.R. 302.3. Under 42 U.S.C. § 9603, the person in charge of a

stract Service Registry Numbers ("CASRNs") in order to be considered hazardous under CERCLA. Since Table 302.4 does not provide RQs or CASRNs for the generic compounds in Alcan's used emulsion, it is Alcan's view that they are therefore not "listed" hazardous substances under the meaning of *section* 302.4(a), 40 C.F.R. § 302.4(a).[16] The Government disagrees, and contends that the generic designations are not mere headings inserted by the drafters of Table 302.4, but are substantive categories of hazardous substances that trigger CERCLA liability. In addition, the Government notes that CERCLA does not require a substance to have an RQ or a CASRN number to be considered hazardous. The district court, by adopting the reasoning in *Alcan New York,* properly endorsed the Government's position.

First, section 101(14) of CERCLA defines a hazardous substance to include "any toxic pollutant listed under section 1317(a) of Title 33 [the Clean Water Act]." 42 U.S.C. § 9601(14). The generic compounds contained in Alcan's emulsion *are* "listed" under 40 C.F.R. § 401.15, the list of toxic pollutants promulgated pursuant to section 1317(a). Thus, there is no need to reach the significance of RQs or CASRNs under Table 302.4 to determine whether generic compounds are "hazardous" by virtue of their listing under that Table.

Second, the fact that Table 302.4 does not provide CASRNs for generic categories is irrelevant, as CASRNs are "for convenience of the user only." 40 C.F.R. § 116.4. *Accord, City of New York v. Exxon,* 766 F.Supp. 177, 182 (S.D.N.Y.1991) ("the fact that the generic headings have no ... [CASRNs] assigned to them is of no significance"). Further, cadmium, chromium, lead and zinc *do* have CASRNs listed in the regulations. *See* 40 C.F.R. 302.4 Appendix A. It also appears that the absence of RQ numbers for generic catego-

ries is irrelevant to CERCLA liability. Indeed, EPA has explained why it decided not to establish RQs for the many broad generic classes of organic and metallic compounds designated as toxic pollutants under section 307(a) of the Clean Water Act:

It was recognized that to establish a single RQ for broad classes of hazardous substances would be inappropriate for many of the compounds within each class. Many of the generic classes of compounds encompass hundreds or even thousands of specific compounds. It would be virtually impossible for the Agency to develop a reportable quantity for a generic class of compounds that would take into account the varying characteristics of all of the specific compounds in the class.

50 Fed.Reg. 13,461.

EPA has further stated that generic categories of substances are nonetheless considered "hazardous substances":

Several commentators were unsure of the Agency's position on reporting and liability for generic classes.... EPA has determined that the notification requirements need apply only to those specific compounds for which RQs are listed in Table 302.4, rather than to the generic classes of compounds. However, as the Agency indicated in the NPRM preamble, this does not preclude liability with respect to releases of specific compounds which are within one of these generic listings but which are not listed in Table 302.4. In other words, a releaser is liable for the cleanup of releases of hazardous substances which fall under any of the broad, generic classes, but does not have to report such releases when the specific compounds, and hence the RQs, are not listed in Table 302.4.

*Id.* at 13,461.[17]

■ EPA's interpretation of the statute it is charged with enforcing is entitled to

---

facility is required to notify EPA immediately of any release of a hazardous substance in a quantity equal to or exceeding the RQ for that substance.

**16.** Section 302.4(a) provides, *"Listed hazardous substances.* The elements and compounds and

hazardous wastes appearing in Table 302.4 are designated as hazardous substances under section 102(a) of the Act."

**17.** It is also significant that Table 302.4 does not include a generic category for all related substances. Thus, EPA chose to deem hazardous

considerable deference, and must be adhered to where it is reasonable and consistent with the language of the statute. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *see also Sacred Heart*, 958 F.2d at 543–45. Moreover, an EPA Administrator's interpretation of his own regulations is entitled to even greater deference. *Sacred Heart*, 958 F.2d at 543–45; *Vermont v. Thomas*, 850 F.2d 99, 102 (2d Cir.1988). For these reasons the district court, by adopting *Alcan New York*, correctly concluded that the absence of an RQ or CASRN number does not signify that the substance is not "hazardous." *Accord, City of New York v. Exxon Corp.*, 766 F.Supp. at 182.[18]

In sum, the only question before us in this regard is whether the substances Alcan *admits* existed in its used emulsion are listed in any of the statutory and regulatory schemes incorporated by section 101(14), 42 U.S.C. § 9601(14). Alcan has conceded that its emulsion contained trace quantities of cadmium, chromium, copper, lead and zinc. App. at 43. Those compounds are listed as hazardous under 40 C.F.R. § 401.15, promulgated pursuant to the Clean Water Act, 33 U.S.C. § 1317(a). Further, these compounds are "listed" under Table 302.4 because the absence of CASRN or RQ numbers is irrelevant. Hence, they are hazardous substances.

2. Section 302.4(b):

The foregoing determination that the generic compounds in Alcan's emulsion are "listed" under the meaning of section 302.-4(a) (40 C.F.R. § 302.4(a)) also disposes of

Alcan's contention that the district court erred in failing to determine whether the compounds exhibit the characteristics of hazardous substances pursuant to section 302.4(b). Section 302.4(b) provides:

*Unlisted hazardous substances.* A solid waste, as defined in 40 CFR 261.2, which is not excluded from regulation as a hazardous waste under 40 CFR 261.4(b), is a hazardous substance under section 101(14) of the Act *if it exhibits any of the characteristics identified in 40 CFR 261.20 through 261.24.* (emphasis supplied).

However, because generic compounds *are* "listed" hazardous substances under Table 302.4, we need not determine whether they exhibit the characteristics set forth in 40 C.F.R. §§ 261.20 through 261.24. In addition, as the district court observed, the compounds in Alcan's emulsion are hazardous by virtue of their designation as toxic pollutants under the Clean Water Act.[19]

3. May, Not Shall:

Alcan also deems it significant that EPA has explained that "CERCLA liability *may* still attach to releases of specific compounds that are within one of the generic listings but not specifically listed in Table 302.4." 50 Fed.Reg. 13,472–73 (emphasis supplied). In Alcan's view, if EPA intended generic categories to constitute hazardous substances in every instance, it would have used the word "shall." However, as the court in *City of New York v. Exxon Corp.* pointed out, "[t]he use of the word 'may' simply reflects EPA's recognition that CERCLA liability attaches only if all elements of a CERCLA cause of action are established." 766 F.Supp. at 183 n. 1.

---

only certain broad categories of substances, not all.

**18.** While reading the statute to include generic compounds within the meaning of hazardous substances leads to a duplicative listing of wastes containing generic compounds, this is not a fatal flaw and, moreover, is not the only place in which the statute is duplicative. This duplication stems from the fact that section 101(14) of CERCLA incorporates various statutory schemes and the regulatory lists promulgated pursuant to those statutes.

**19.** In any event, as the district court noted in *City of New York v. Exxon Corp.*, "the solubility test [pursuant to 40 C.F.R. § 261.20—261.24] is designed to determine the mobility of particular constituents in waste and their potential to contaminate groundwater after leaking from a landfill.... This particular concern—the protection of groundwater—addressed by the EP test is based upon RCRA's regulatory objectives, not on CERCLA's broad, remedial concern for releases into *any* environmental media." 766 F.Supp. at 185 (emphasis in original). Thus we agree with the Government's contention that RCRA's goals differ from those of CERCLA.

4. Environmental Policy:

In Alcan's view, the district court's construction of the statute is at odds with environmental policy because it imposes liability on generators of allegedly "hazardous" substances although the substances pose no real threat to the environment.[20] Alcan's argument, though superficially appealing, is flawed. First, as noted above, the Government responds to "releases" that threaten environmental safety. Thus, it is the *release alone* that must justify the response costs, not the particular waste generated by one given defendant. Here, there is no question but that a release occurred. Second, the fact that a single generator's waste would not in itself justify a response is irrelevant in the multi-generator context, as this would permit a generator to escape liability where the amount of harm it engendered to the environment was minimal, though it was significant when added to other generators' waste. Accordingly, we find that the district court's construction of the statute furthers important environmental goals.[21]

D. CAUSATION:

■ Alcan maintains that, if we decline to construe the determination of "hazardous substance" to encompass a concentration threshold, we must at least require the Government to prove that *Alcan's emulsion* caused or contributed to the release or the Government's incurrence of response costs. The Government contends, and the district court by adopting the reasoning of *Alcan New York* agreed, that the statute

imposes no such causation requirement, but rather requires that the plaintiff in a CERCLA proceeding establish that the *release* or *threatened release* caused the incurrence of response costs; it underscores the difficulty CERCLA plaintiffs would face in the multi-generator context if required to trace the cause of the response costs to each responsible party.[22]

1. Plain Meaning:

The plain meaning of the statute supports the Government's position. As noted above, section 107 imposes liability upon a generator of hazardous substances who contracts with another party to dispose of the hazardous substances at a facility "from which there is a *release, or threatened release which causes the incurrence of response costs.*" 42 U.S.C. § 9607 (emphasis supplied). The statute does not, on its face, require the plaintiff to prove that the generator's *hazardous substances* themselves caused the release or caused the incurrence of response costs; rather, it requires the plaintiff to prove that the *release or threatened release* caused the incurrence of response costs, and that the defendant is a generator of hazardous substances at the facility.

2. Legislative History:

The legislative history also supports the Government's position that CERCLA does not require the plaintiff to establish a specific causal relationship between a generator's waste and the release or the plaintiff's incurrence of response costs. It appears that the early House of Representatives' version of CERCLA imposed liability

**20.** As we discuss below, whether Alcan is correct that its emulsion poses no threat to the environment, even when added to other hazardous substances, should be thoroughly investigated on remand in the factual hearing concerning the divisibility of harm.

**21.** Alcan's argument that the district court's decision is inconsistent with prior EPA actions is without merit. The facts in this case are not identical to those in cases cited by Alcan where EPA did not seek to impose CERCLA liability. Further, it is far from clear that EPA took the action it did in those cases because it determined that materials containing only trace elements of listed hazardous substances were not hazardous under CERCLA.

Equally unavailing is Alcan's assertion that the district court's opinion conflicts with EPA's recently promulgated national policy concerning household waste. The fact that EPA has determined that liability should not be imposed on homeowners for household waste does not indicate that household waste is not hazardous, but rather evinces EPA's understanding that household waste *does* include hazardous substances, for otherwise there would be no need to create an exception. Obviously, there are significant policy reasons to exclude homeowners from CERCLA liability.

**22.** Of course, if the defendant is not a responsible party with respect to the facility, then it cannot be liable.

upon those persons who "caused or contributed to the release or threatened release." H.R. 7020, 96th Cong., 2d Sess. § 3071(a)(D), 126 Cong.Rec. 26,779. However, the version ultimately passed by Congress deleted the causation requirement and instead imposed liability upon a *class* of responsible persons without regard to whether the person specifically caused or contributed to the release and the resultant response costs. *See* 126 Cong.Rec. 31,981–82. Moreover, Congress added three limited defenses to liability based on causation which are contained in 42 U.S.C. § 9607(b): acts of God, acts of war, and acts or omissions of a contractually unrelated third party when the defendant exercised due care and took appropriate responses. Imputing a specific causation requirement would render these defenses superfluous.

In sum, the legislative history indicates that Congress considered and rejected a requirement that the plaintiff establish that the defendant's waste caused or contributed to the release or the incurrence of response costs.

3. Jurisprudence:

Further, virtually every court that has considered this question has held that a CERCLA plaintiff need not establish a direct causal connection between the defendant's hazardous substances and the release or the plaintiff's incurrence of response costs. For example, in *New York v. Shore Realty Corp.*, the defendant, an owner of a facility, asked the Court of Appeals for the Second Circuit to read this "causation" requirement into section 107(a). The court declined that invitation and held, "section 9607(a)(1) unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release without regard to causation." 759 F.2d at 1044 (footnote omitted). The court observed that "there are defenses for causation solely by an act of God, an act of war, or acts or omissions of a third party other than an employee or agent of the defendant or one whose act or omission occurs in connection with a contractual relationship with the defendant," *id.* at 1042, and it found that these defenses would be superfluous if the statute imposed a causation requirement. It conclud-

ed, "[w]ithout a clear congressional command otherwise, we will not construe a statute in any way that makes some of its provisions surplusage." *Id.* at 1044.

The court of appeals in *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), extended *Shore Realty's* analysis to generators of hazardous waste. The court of appeals there rejected a similar argument that the CERCLA plaintiff was required to establish that the waste the defendant generator sent to the facility caused or contributed to the environmental harm, observing that Congress deleted the causation language from CERCLA precisely because it was aware of the difficulties plaintiffs would confront in the multi-generator context if required to prove such a connection. It held, "[i]n deleting causation language from section 107(a), we assume as have many other courts, that Congress knew of the synergistic and migratory capacities of leaking chemical waste, and the technological infeasibility of tracing improperly disposed waste to its source." *Id.* at 170 (footnote omitted).

Other cases are in accord. *See, e.g., Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d at 1152–54 (the only causation required under CERCLA is that the release or threatened release cause the response costs; plaintiff need not establish that the defendant's waste caused or contributed to the response costs); *United States v. Bliss,* 667 F.Supp. 1298, 1309 (E.D.Mo.1987) ("traditional tort notions, such as proximate cause, do not apply"); *United States v. Wade,* 577 F.Supp. at 1333 ("the release which results in the incurrence of response costs and liability need only be of 'a' hazardous substance and not necessarily one contained in the defendant's waste. The only required nexus between the defendant and the site is that the defendant have dumped his waste there and that the hazardous substances found in the defendant's waste are also found at the site.")

Despite Alcan's assertion, *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, is not to

the contrary. There, the Court of Appeals for the Fifth Circuit held that the plaintiff may not recover response costs unless the release posed a threat to the public or the environment. In the court's view, "the question of whether a release has caused the incurrence of response costs should rest upon a factual inquiry into the circumstances of a case and the relevant factual inquiry should focus on whether the particular hazard justified any response actions." *Id.* at 670. The court did not hold, as Alcan suggests, that the factual investigation would concern whether the *defendant's waste* caused the incurrence of response costs. Moreover, the environmental injury at issue in *Amoco* resulted from one generator's pollution, and the court expressly noted that other courts have concluded that, "in cases involving multiple sources of contamination, a plaintiff need not prove a specific causal link between costs incurred and an individual generator's waste." *Id.* at 670 n. 8. This distinction is significant for, in the single generator context, if the response costs were justified, the defendant necessarily caused the incurrence of those costs. However, in the multi-generator context, the fact that the response costs were justified would not *per force* signify that each generator's waste caused the release and the resultant response costs. *See also City of New York v. Exxon Corp.*, 766 F.Supp. at 194.[23]

Decisions rejecting a causation requirement between the defendant's waste and the release or the incurrence of response costs are well-reasoned, consistent with the plain language of the statute and consistent with the legislative history of CERCLA. Accordingly, we reject Alcan's argument that the Government must prove that Alcan's emulsion deposited in the Borehole caused the release or caused the Government to incur response costs. Rather, the Government must simply prove that the defendant's hazardous substances were deposited at the site from which there was a release and that the *release* caused the incurrence of response costs.

## E. PETROLEUM EXCLUSION:

■ Alcan further argues that its emulsion constitutes "petroleum" within the meaning of 42 U.S.C. § 9601 and is thus excluded from CERCLA liability. Section 9601(14) provides: "[t]he term [hazardous substance] does not include *petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph....*" (emphasis supplied). According to Alcan, EPA has interpreted the petroleum exclusion to extend to "used oil" containing concentrations of hazardous substances at levels equal to or less than that found in virgin oil. Alcan contends that its emulsion is "used oil" with concentration levels of cadmium, chromium, copper, lead and zinc that are lower than the levels of these compounds in virgin oil and therefore falls within the petroleum exclusion. Although this argument has superficial appeal, it cannot withstand close scrutiny.

First, and most importantly, EPA has distinguished between oil that naturally contains low levels of hazardous substances and oil to which hazardous substances have been added through use. Although EPA has extended the petroleum exclusion to the former category of oily substances, it has specifically declined to extend such protection to the latter category. In EPA's words: "EPA does not consider materials such as waste oil to which listed CERCLA substances have been added to be within the petroleum exclusion." 50 Fed.Reg. 13,460 (1985). Thus, the conclusion of the district court in *Alcan New York* that "a plain reading of the 'exclusionary' provision does not warrant the inclusion of oil which has become contaminated with hazardous substances through use; rather what does come within the ambit of the 'petroleum exclusion' is the oil

**23.** Alcan is correct that the court in *Louisiana–Pacific Corp. v. Asarco, Inc.*, 735 F.Supp. 358, 362 (W.D.Wash.1990), imposed the causation requirement that Alcan requests. The court there held: "liability does not attach because the defendant caused 'a release,' but because it caused

'response costs.'" With all due respect, we believe that the court reached its conclusion based on an incorrect analysis of *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, and *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, and we decline to follow it.

or oil fraction which naturally contains the hazardous substance(s) unless the fraction itself is specifically listed or designated as a hazardous substance," is in harmony with EPA's interpretation. 755 F.Supp. at 539. Moreover, EPA's interpretation of the petroleum exclusion comports with the relevant legislative history which indicates that the exclusion was intended for oil spills, not for releases of oil which has become infused with hazardous substances through use. *See* S.Rep. No. 848, 96th Cong., 2d Sess. 30–31 (1980), *reprinted in A Legislative History*, Vol. I, at 405.

Alcan has admitted that the hot-rolling process adds hazardous substances to the emulsion. Thus, it has effectively conceded that its emulsion does not fall within the scope of the petroleum exclusion as construed by EPA.[24]

## F. DIVISIBILITY OF HARM:

■ The foregoing conclusions that (1) there is no quantitative threshold in the definition of hazardous substances and (2) the plaintiff need not establish a causal connection between a given defendant's waste and the release or the incurrence of response costs would initially appear to lead to unfair imposition of liability. As Alcan asserts, this definition of "hazardous substances" effectively renders everything in the universe hazardous, including, for example, federally approved drinking water. When this definition is read in conjunction with the rule that specific causation is not required, CERCLA seemingly would impose liability on every generator of hazardous waste, although that generator could not, on its own, have caused any environmental harm.[25]

While Alcan's assertion is of considerable strength, the Government's rebuttal is equally forceful. It notes that individual defendants must be held responsible for environmental injury brought about by the actions of multiple defendants, even if no single defendant itself could have produced the harm, for otherwise "each defendant in a multi-defendant case could avoid liability by relying on the low concentrations of hazardous substances in its waste, while the plaintiff is left with the substantial clean-up costs associated with the defendant's accumulated wastes." Government's Br. at 32. The Government reasons that this strong public interest in forcing polluters in the multi-generator context to pay outweighs a defendant's interest in avoiding liability even if that defendant has not acted in an environmentally unsound fashion when its actions are viewed without regard to the actions of others. The court in *United States v. Western Processing Co.*, adopting the position advanced by the Government in this case, observed:

it is entirely possible for a hazardous waste facility to be comprised of entirely small amounts from many contributors. If each PRP could make [Alcan's] argument, *i.e.*, that its particular contribution did not warrant remediation and thus that it should not be liable for any costs, *no* party would be liable, despite the fact

---

**24.** Alcan raises other challenges, but they are without merit. It asserts that the statute is impermissibly vague, but the district court by following *Alcan New York* correctly rejected that challenge because the statute provides fair notice of what is considered a CERCLA hazardous substance. Moreover, it has long been established that civil enactments are reviewed with greater leniency than criminal statutes. *See Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *Kreimer v. Bureau of Police of Morristown*, 958 F.2d 1242, 1266–70 (3d Cir.1992), to be reported at 958 F.2d 1242. In addition, Alcan alleges that it has been subjected to unfair prosecution in violation of the equal protection clause, but it has not put forward any evidence to support that assertion. Thus, the district court's rejection of this claim was correct.

**25.** Dean Prosser's hornbook highlights the paradox of liability where acts harmless in themselves together cause damage, observing:

A very troublesome question arises where the acts of each of two or more parties, standing alone, would not be wrongful, but together they cause harm to the plaintiff. If several defendants independently pollute a stream, the impurities traceable to each may be negligible and harmless, but all together may render the water entirely unfit for use. The difficulty lies in the fact that each defendant alone would have committed no tort. There would have been no negligence, and no nuisance, since the individual use of the stream would have been a reasonable use, and no harm would have resulted.

William L. Prosser, *Law of Torts*, § 52, at 322 (4th ed.1971).

that the site, as a whole, needed to be cleaned up and the government incurred costs in doing so.

734 F.Supp. at 937 (emphasis in original).

We find some merit in the arguments advanced by both the Government and Alcan. Accordingly, in our view, the common law principles of joint and several liability provide the only means to achieve the proper balance between Alcan's and the Government's conflicting interests and to infuse fairness into the statutory scheme without distorting its plain meaning or disregarding congressional intent.

CERCLA does not specifically provide for joint and several liability in a case involving multiple defendants. Further, both the House and Senate deleted provisions imposing joint and several liability from their respective versions of the statute before its enactment. However, as the court explained in *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 808 (S.D.Ohio 1983), at the conclusion of an exhaustive review of statements made by the legislation's sponsors concerning the deletion of joint and several liability,

> the scope of liability and term joint and several liability were deleted to avoid a mandatory legislative standard applicable in all situations which might produce inequitable results in some cases. 126 Cong.Rec. at S14964, S15004, H11787, H11799, 126 Cong.Rec. H9465 (Sept. 23, 1980) (remarks of Rep. Madigan), H9466 (Remarks of Rep. Stockman). The deletion was not intended as a rejection of joint and several liability. 126 Cong.Rec. S14964, H11787, H11799 (Nov. 24, 1980). Rather, the term was omitted in order to have the scope of liability determined under common law principles, where a court performing a case by case evaluation of the complex factual scenarios associated with multiple-generator waste sites will assess the propriety of applying joint and several liability on an individual basis.

Other courts have agreed that Congress' deletion of joint and several liability from

the final version of the statute signalled its intent to have the courts determine, in accordance with traditional common law principles, whether such liability is proper under the circumstances. *See, e.g., O'Neil v. Picillo*, 883 F.2d 176, 178 (1st Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v. Monsanto Co.*, 858 F.2d at 171 n. 3. *Accord, B.F. Goodrich*, 958 F.2d 1192, 1198 (2d Cir.1992). In determining whether the imposition of joint and several liability upon Alcan is proper, so that it may be held liable for the Government's full response costs less what had been recovered from the settling defendants, we turn to the Restatement (Second) of Torts for guidance.[26]

Section 433A of the Restatement provides that, when two or more joint tortfeasors acting independently cause a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the harm that the individual tortfeasor has caused. It states,

> (1) Damages for harm are to be apportioned among two or more causes where
>
> > (a) there are distinct harms, or
> >
> > (b) there is a reasonable basis for determining the contribution of each cause to a single harm.
>
> (2) Damages for any other harm cannot be apportioned among two or more causes.

Similarly, section 881 sets forth the affirmative defense based upon the divisibility of harm rule in section 433A:

> If two or more persons, acting independently, tortiously cause distinct harms or a single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused.

However, where joint tortfeasors cause a single and indivisible harm for which there is no reasonable basis for division accord-

---

**26.** By adhering to the rules set forth in the Restatement, we also further the interest in achieving uniformity in the articulation of federal common law that governs CERCLA's interstices. *Accord, United States v. Monsanto*, 858 F.2d at 171–72.

ing to the contribution of each, each tortfeasor is subject to liability for the entire harm. Section 875 recites:

> Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.

Obviously, of critical importance in this analysis is whether a harm is divisible and reasonably capable of apportionment, or indivisible, thereby subjecting the tortfeasor to potentially far-reaching liability.[27]

Under the Restatement, where a joint tortfeasor seeks to apportion the full amount of a plaintiff's damages according to that tortfeasor's own contribution to the harm, it is the tortfeasor's burden to establish that the damages are capable of such apportionment.[28] As the comments concerning this issue explain, the burden of proving that the harm is capable of apportionment is placed on the tortfeasor to avoid:

> the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before is can be apportioned. In such a case the defendant may justly be required to assume the burden of producing that evidence, or if he is not able to do so, of bearing full responsibility. As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm should fall upon the former.

Comment on Section 433 B subsection (2).

These provisions underscore the intensely factual nature of the "divisibility" issue and thus highlight the district court's error in granting summary judgment for the full claim in favor of EPA without conducting a hearing. For this reason, we will remand this case for the court to determine whether there is a reasonable basis for limiting Alcan's liability based on its personal contribution to the harm to the Susquehanna River.

Our conclusions on this point are completely consistent with our previous discussion on causation, as there we were concerned with the Government's burden in demonstrating liability in the first instance. Here we are dealing with Alcan's effort to avoid liability otherwise established. We observe in this regard that Alcan's burden in attempting to prove the divisibility of harm to the Susquehanna River is substantial, and the analysis will be factually complex as it will require an assessment of the relative toxicity, migratory potential and synergistic capacity of the hazardous waste at issue. *United States v. Monsanto Co.*, 858 F.2d at 172 n. 26. *See also United States v. Chem–Dyne Corp.*, 572 F.Supp. at 811. But Alcan should be permitted this opportunity to limit or avoid liability. If Alcan succeeds in this endeavor, it should only be liable for that portion of the harm fairly attributable to it. *Accord, United States v. Marisol, Inc.*, 725 F.Supp. 833, 843 (M.D.Pa.1989) ("the question of the relative contribution of a particular defendant to a waste site may impact upon the issue of joint and several liability").

Alcan maintains that there is no need for a hearing because, not only is the harm divisible, but its relative contribution to the

---

**27.** Interestingly, the drafters of the Restatement found that joint pollution of water is typically subject to the divisibility rule. They write:

> There are other kinds of harm which, while not so clearly marked out as severable into distinct parts, are still capable of division upon a reasonable and rational basis, and of fair apportionment among the causes responsible.... *Such apportionment is commonly made in cases of private nuisance, where the pollution of a stream ... has interfered with the plaintiff's use and enjoyment of his land.*

Section 433 A, Comment d (emphasis supplied). *See, e.g., Somerset Villa, Inc. v. Lee's Summit*, 436 S.W.2d 658 (Mo.1968).

**28.** Section 433 B(2) provides, "Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor."

injury to the Susquehanna River is zero. According to Alcan, "[i]t is technically impossible to have a release or threatened release such that a clean-up would be authorized or justified under the National Contingency Plan as a result of the addition of the metal compounds in the Alcan emulsion to the Butler Site. When one adds two materials that have the same concentrations of an element or compound, the net result is the *same* concentration. It can never result in a higher concentration." Appellant's Br. at 18 (emphasis in original). Alcan's Reply Brief similarly asserts that "below ambient levels of any substance can never cause or contribute to a release or response costs." Appellant's Reply Br. at 10–11.

█ The district court did not specifically address this argument. Indeed, in light of their belief that *Alcan New York* was dispositive of the arguments advanced by Alcan in this case, neither the magistrate judge nor the district court engaged in any factual investigation concerning the divisibility of the environmental harm caused to the Susquehanna River as a result of the release of hazardous substances from the Borehole. However, we are not the proper forum to consider Alcan's argument as we have no way of determining whether the

trace levels of metallic compounds in Alcan's used emulsion became concentrated and thereby posed an environmental threat. Furthermore, there may be other circumstances bearing on this issue of which we are not even aware. Thus, the district court should re-evaluate Alcan's contention in light of the facts developed in the hearing on this issue.[29]

In sum, on remand, the district court must permit Alcan to attempt to prove that the harm is divisible and that the damages are capable of some reasonable apportionment. We note that the Government need not prove that Alcan's emulsion caused the release or the response costs. On the other hand, if Alcan proves that the emulsion did not or could not, *when mixed with other hazardous wastes,* contribute to the release and the resultant response costs, then Alcan should not be responsible for *any* response costs. In this sense, our result thus injects causation into the equation but, as we have already pointed out, places the burden of proof on the defendant instead of the plaintiff. We think that this result is consistent with the statutory scheme and yet recognizes that there must be some reason for the imposition of CERCLA liability. Our result seems particularly appropriate in light of the expan-

---

**29.** In this vein, we also reject the Government's argument that a hearing is unnecessary because Alcan has admitted that its emulsion was "commingled" with the other generators' waste: "commingled" waste is not synonymous with "indivisible" harm. We observe that some courts have held that a generator may present evidence that it has paid more than its "fair share" in a contribution proceeding, expressly permitted under 42 U.S.C. § 9613(f)(2). *See, e.g., United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1507 (6th Cir.1989) *cert. denied,* 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990); *United States v. Monsanto,* 858 F.2d at 173. In a sense, the "contribution" inquiry involves an analysis similar to the "divisibility" inquiry, as both focus on what harm the defendant caused. However, we believe that this inquiry, to the extent that it is the same as that discussed in above-noted cases, is best resolved at the initial liability phase and not at the contribution phase since it involves precisely relative degrees of *liability.* Thus, if the defendant can prove that the harm is divisible and that it only caused some portion of the injury, it should only be held liable for that amount. In our view, the logical consequence of delaying the apportion-

ment determination may well be drastic, for it seems clear that a defendant could easily be strong-armed into settling where other defendants have settled in order to avoid being held liable for the remainder of the response costs. Indeed, in this case the court determined that Alcan, one of 20 defendants, was liable for $473,790.18 in response costs, although the total response costs amounted to $1,302,290.18. Thus, although Alcan comprised only 5% of the defendant pool, it was required by the court to absorb over 36% of the costs. Furthermore, Alcan's share of the liability seems to be disproportionate on a volume basis as well. We also point out that contribution will probably not be available from a settling defendant in an action by the United States. 42 U.S.C. § 9613(f)(2).

We note, of course, that a determination in a given case that harm is indivisible will *not* negate a defendant's right to seek contribution from other non-settling defendants, as the contribution proceeding is an equitable one in which a court is permitted to allocate response costs based on factors it deems appropriate, whereas the court is not vested with such discretion in the divisibility determination.

sive meaning of "hazardous substance."[30] Of course, if Alcan cannot prove that it should not be liable for any response costs or cannot prove that the harm is divisible and that the damages are capable of some reasonable apportionment, it will be liable for the full claim of $473,790.18.

## III.

## CONCLUSION

In conclusion, the district court correctly determined that CERCLA's definition of "hazardous substance" does not include a threshold requirement. This interpretation is fully consistent with the plain language of the statute, the legislative history, EPA regulations and EPA policy. In addition, the court correctly determined that a CERCLA plaintiff need not establish a causal connection between a generator's hazardous substances and the release or the incurrence of response costs. The district court was also correct in determining that Alcan's used emulsion does not fall within the petroleum exclusion under 42 U.S.C. § 9601(14), and it properly rejected Alcan's constitutional challenges.

 However, we find that the court should have conducted a hearing to determine the divisibility of harm to the Susquehanna River, and will remand the case for the court to do so. If Alcan can establish in that hearing that the harm is capable of reasonable apportionment, then it should be held liable only for the response costs relating to that portion of harm to which it contributed. Further, if Alcan can establish that the hazardous substances in its emulsion could not, when added to other hazardous substances, have caused or contributed to the release or the resultant response costs, then it should not be liable for any of the response costs. Accordingly, we will vacate the judgment of the district court of May 8, 1991, and will remand the matter for further proceedings consistent with this opinion.

30. In addition, our approach is consistent with that in *O'Neil v. Picillo*, 883 F.2d at 182, and *United States v. Monsanto Co.*, 858 F.2d at 166, in which the courts approved the imposition of joint and several liability after determining that the harm was in fact indivisible.

## SUR PETITION FOR REHEARING

July 27, 1992.

PRESENT: SLOVITER, *Chief Judge*, and STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, NYGAARD, and ALITO, *Circuit Judges*, and DEBEVOISE, *District Judge.*[**]

The petition for rehearing filed by the appellee in the above captioned matter having been sumitted to the judges who participated in the decision of this court and to all the other available circuit judges of the court in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.