**UNITED STATES of America,**
**Plaintiff,**

v.

**Jerome LIGHTMAN, et al., Defendants.**

**Civil Action No. 92–4710 (JBS).**

United States District Court,
D. New Jersey.

June 30, 1999.

Robert A. Gladstone, Nan Bernardo, Shanley & Fisher, P.C., Morristown, NJ, for Joint Defense Group.

Eric S. Aronson, Donna Libretti Cooke, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Newark, NJ, for Defendant Stepan Co.

## OPINION

SIMANDLE, District Judge.

This matter is before the court on the motion of the members of the Joint Defense Group ("JDG")[1] for partial summary judgment declaring defendant Stepan Company ("Stepan") severally liable to the JDG under Section 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613, for past and future response costs the JDG has incurred at the Ewan and D'Imperio Superfund Sites, and on Stepan's cross-motion for summary judgment dismissing the JDG's contribution claims under § 113 of CERCLA. For the reasons set forth below, the court denies without prejudice the JDG's motion for partial summary judgment declaring Stepan severally liable to the JDG under § 113 for past and future response costs the JDG has incurred at the Ewan and D'Imperio Sites and denies Stepan's cross-motion for summary judgment dismissing the JDG's claims for contribution under § 113.

### BACKGROUND

This is a civil action to identify the parties that should bear the costs of cleaning up environmental contamination at the Ewan and D'Imperio Superfund Sites as the result of illegal dumping of hazardous waste at the sites by the Lightman Drum Company ("LDC") during the mid–1970's. The Ewan Site is in Shamong Township, Burlington County, New Jersey; the D'Imperio Site is in Hamilton Township, Atlantic County, New Jersey.

*Lightman Drum Company*

LDC and Jerome Lightman have been determined to be responsible parties that transported and disposed of hazardous wastes at the D'Imperio and Ewan Sites, and they are severally liable to the JDG for contribution for past and future costs at those sites under § 113 of CERCLA, as set forth in a separate Opinion and Order of today's date.

LDC began operation as a business buying and selling reconditioned 55–gallon drums in the late 1950's or early 1960's. (Gladstone Cert., Ex. 1, pg. 3, A–1 and A–3; Ex. 10, A–1 and A–3.) In April of 1974, LDC moved its operation from Philadelphia to a new location in the vicinity of Berlin, New Jersey. (Gladstone Cert., Ex. 1, pg. 3, A–2; Ex. 10, A–2.)

LDC's reconditioned drum business consisted of removing empty drums from customer locations, selling them directly to a drum reconditioner, and selling recondi-

---

**1.** The members of the JDG are: Aluminum Shapes Inc., Colonial Heights Packaging, Inc., Continental Holding, Inc., Croda Inks Corporation, DAP, Inc., Scott Paper Company, Sonoco Products Company, Union Carbide Corporation, USG Corporation, USX Corporation, Air Products & Chemicals, Inc., Kiwi Polish Company, a/k/a Kiwi Brands, Inc., Stauffer Chemical Corporation, Synthane–Taylor Company, Whiting Paterson Company, Inc., and Wilmington Chemical Company.

tioned drums to its customers. (Gladstone Cert., Ex. 1, pgs. 3–4, A–4 through A–6; Ex. 10, A–4 through A–6.) Though empty drums received by LDC for reconditioning may have contained a waste residue, LDC did not begin removing drums filled with waste until 1972. (Gladstone Cert., Ex. 1, pg. 5, A–8; Ex. 10, A–8.)

The founder and president of LDC was Marvin ("Mike") Lightman. He was in charge of LDC operations during his lifetime. (Gladstone Cert., Ex. 1, pg. 6, A–12 and A–13; Ex. 10, A–12 and A–13.) It was principally he who made arrangements for drum waste disposal at the various disposal locations utilized by LDC. (Gladstone Cert., Ex. 1, pg. 6, A–14; Ex. 10, A–14.)

Jerome Lightman is the son of Mike Lightman. Between 1970 and 1978, Jerome Lightman served as Vice–President of LDC. (Gladstone Cert., Ex. 1, pgs. 6–7, A–15 & A–16; Ex. 10, A–16.) As Vice–President, Jerome Lightman served LDC as a truck driver, and maintained oversight responsibilities of the LDC yard. (Gladstone Cert., Ex. 1, pg. 7, A–17 and A–18; Ex. 10, A–17 and A–18.) Jerome Lightman also supervised operations for Mike Lightman when Mike Lightman was not available and made disposal decisions at such times, some of which occurred during the relevant time period ("RTP") in this litigation. (Gladstone Cert., Ex. 2, at 237:23 through 238:10.) Jerome Lightman assumed the responsibilities previously undertaken by his father after his father became ill in 1976. Mike Lightman died in September, 1978. (Gladstone Cert., Ex. 1, pgs. 7–8, A–19 through A–22; Ex. 10, A–19 through A–22.)

Generally, the RTP in this litigation runs from the Fall of 1974 to December 31, 1976, during which time LDC allegedly disposed of hazardous waste at the Ewan Property Superfund Site ("Ewan Site") in Shamong Township, Burlington County, and the D'Imperio Property Superfund Site ("D'Imperio Site") in Hamilton Township, Atlantic County. More specifically, the JDG contends that the RTP for the D'Imperio Site runs from October 1974

through December 1976 and that the RTP for the Ewan Site runs from March 1975 through October 1975, while Stepan contends that the RTP for the D'Imperio Site runs from December 1974 through December 1976 with use suspended from May 1975 through October 1975 and that the RTP for the Ewan Site runs from April 1975 through October 1975.

Although it also used other disposal sites during the RTP, LDC admits that it disposed of waste at the Ewan and D'Imperio Sites during the RTP. (Gladstone Cert., Ex. 10, E–1, E–2 and G–1.) The JDG defendants were customers of LDC during the RTP, as was Stepan. (Gladstone Cert., Exhibit "4", pg. 4.)

*LDC's Waste Disposal Procedures*

LDC obtained waste drums from its customers by hauling trailers to its customers' premises and loading the customers' waste drums onto the trailers. The tractor trailers were operated by truck drivers employed by LDC, who were sometimes accompanied by LDC laborers. (Gladstone Cert., Ex. 1, pgs. 8–10, A–23 & 24 and A–30; Ex. 10, A–23, A–24 and A–30.) These LDC employees included Earl Emmons, Ed Hook, Lexington Ford, Jim McGroarty, Jim Smith, and Fred Ellsworth. (Gladstone Cert., Ex. 1, pgs. 9–10, A–25 through A–29; Ex. 10, A–25 through A–29.)

Typically, not more than 80 full drums were hauled on a single trailer, though sometimes empty drums were stacked on top of the full drums on the floor of the trailer. (Gladstone Cert., Ex. 8, at 12:7–23; Ex. 9, at 94:23 through 95:18; Ex. 10, B–3 and B–4.)

When a pickup of waste drums was made at the premises of a waste drum customer, the trailer would typically be returned to the LDC yard. (Gladstone Cert., Ex. 10, B–6.) Sometimes drums were removed from the trailer and consolidated with drums on a different trailer to make a full load for disposal. (Gladstone Cert., Ex. 10, B–12.) This was accomplished by LDC employees, who stacked

the drums in the LDC yard. (Gladstone Cert., Ex. 1, pg. 10, A–31 and A–32.) On other occasions, trailers were taken from the LDC yard to a disposal location without consolidating the drums onto other trailers. (Gladstone Cert., Ex. 8, at 14:10–24.) Trailer loads of waste drums generally remained in the LDC yard from between one day and two weeks, although they would rarely remain at the yard longer than a week. (Gladstone Cert., Ex. 2, at 251:3–5; Ex. 1, pg. 13, B–6 and B–7; Ex. 10, B–6 and B–7.) On a few occasions, LDC drivers hauled waste directly from a customer to a disposal location. (Gladstone Cert., Ex. 1, pg. 16, B–16; Ex. 10, B–16.)

Upon arrival at a disposal location, LDC employees had an incentive to save waste drums because LDC utilized such drums in its drum reconditioning business; therefore, LDC employees tried to save drums. (Gladstone Cert., Ex. 1, pg. 18, B–24 and B–25; Ex. 10, B–24 and B–25.) Drums were typically saved by pouring their contents out of the drum and onto the surface of the disposal site. (Gladstone Cert., Ex. 8, at 20:17 through 21: 2; Ex. 10, B–17.) On occasion, the contents of waste drums may have caused difficulty in disposal because of their chemical composition or physical state. (Gladstone Cert., Ex. 1, pg. 17, B–22 and B–23.) In such cases, LDC employees sometimes sacrificed entire drums, including their contents. (Gladstone Cert., Ex. 1, pg. 16, B–19; Ex. 10, B–19.) As indicated, numerous drums were sacrificed at the Ewan Site, whereas relatively few were sacrificed at the D'Imperio Site. (Gladstone Cert., Ex. 1, pg. 19, B–28 and B–30.)

Because Mike Lightman was in charge of LDC operations during the RTP, it was most often he who directed the drivers as to what disposal sites should be utilized. (Gladstone Cert., Ex. 2, at 237:23 through 238:10.) In his absence, however, Jerome Lightman determined the disposal location to be used. The choice of a disposal site depended on the availability and accessibility of the sites being utilized, as well as the nature of the waste. (Gladstone Cert., Ex.

2, at 238:22 through 240:11; Ex. 10, B–14.) Though landfill sites were licensed by the State of New Jersey during the RTP, neither the D'Imperio Site nor the Ewan Site was licensed. (Gladstone Cert., Ex. 2, at 248:20–24.) There is no evidence that any of the LDC customers were aware that LDC was disposing of waste at unlicensed landfills. In fact, Jerome Lightman specifically denies advising any LDC customer of that fact. (Gladstone Cert., Ex. 2, at 248:25 through 249:3.)

*Enforcement and Procedural History at the Ewan Site*

The Ewan Site consists of approximately 43 acres of land located approximately two miles south of the Wharton State Forest. Surrounding land use is generally agricultural with single family residential developments. It appears to border both the Pinelands Agricultural and Protection Areas. The Site is within a mile of a down-gradient domestic potable water well. (Gladstone Cert., Ex. 13, pg. 1 of "Decision Summary for Operable Unit One.") The Ewan Site was proposed for inclusion on the National Priorities List ("NPL") in March 1985, and was formally added to the NPL in June 1986. (*Id.* at pg. 3.)

On June 11, 1990, the United States Environmental Protection Agency ("USEPA") issued an Administrative Order, Index No. II—CERCLA—90114 (amended September 1, 1994) and Administrative Order, Index No. II—CERCLA–95–0107 under Section 106 of CERCLA to numerous potentially responsible parties, including the defendants herein. The Ordered generator parties, including Stepan and the JDG defendants, have been performing the remedy required at the Ewan Site by the OU–1 Record of Decision ("ROD") dated September 29, 1988 and the OU–2 ROD of September 29, 1989, and have thereby incurred response costs. (Gladstone Cert., Ex. 14.) Defendants LDC and Jerome Lightman have not contributed to response costs at the Ewan Site. (*Id.*)

*Enforcement and Procedural History at the D'Imperio Site*

The D'Imperio Site is located at the intersection of U.S. Route 322 (Black Horse Pike) and Cologne Avenue in Hamilton Township, Atlantic County. In the late 1970's, the Atlantic County Public Health Department informed the New Jersey Department of Environmental Protection ("NJDEP") of the existence of the D'Imperio Site. NJDEP performed a preliminary investigation at the Site, and informed the USEPA of the D'Imperio dump site area. (Gladstone Cert., Ex. 15, pg. 6, ¶ 5.) The actual dump area was approximately one and one-half acres in size. In September of 1983, the USEPA listed the D'Imperio Site on the NPL, and thereafter conducted a Remedial Investigation/Feasibility Study ("RI/FS") to delineate the nature, extent, and impact of contamination at the D'Imperio Site. (*Id.*) On March 27, 1985, the USEPA issued a ROD which embodied the USEPA selection of the remedy for the D'Imperio Site. The USEPA undertook to remove the contaminated waste, soil, and buried drums from the D'Imperio Site, and in September 1992, it completed the design of the groundwater remediation. (*Id.* at pgs. 7–8.)

On November 4, 1992, the United States filed the Complaint in this matter naming as direct defendants, among others, LDC, Jerome Lightman, Stepan, and certain of the JDG defendants.[2] The Complaint sought reimbursement for past costs for the investigation and removal action which had been undertaken by the USEPA at the D'Imperio Site, and sought a declaration that the defendants were jointly and severally responsible for remediation of the D'Imperio Site. By answer and cross-claims, LDC and Jerome Lightman filed CERCLA § 113 contribution claims against all defendants. All disputes arising out of both the D'Imperio and the Ewan Sites were joined in this litigation by

the Honorable Joel B. Rosen, U.S.M.J., by Supplemental Case Management Order No. 4 dated September 13, 1994.

During the pendency of the lawsuit, the USEPA issued Administrative Order, Index No. II–CERCLA–20117 on August 5, 1993. The Order directed LDC, Jerome Lightman, and 11 alleged generators—all of whom are defendants herein—to remediate the D'Imperio Site in accordance with the ROD dated March 27, 1985, and all attachments thereto. (*Id.* at pg. 10.) Stepan was one of the alleged generators ordered to remediate the D'Imperio Site. The Order provided:

> Stepan Company arranged for the disposal of the Hazardous Substances, pollutants or contaminants, including dodecylbenzene-sulfonic acid, methyl alcohol and xylene still bottoms from its facility in Bordentown, New Jersey.

(*Id.*)

Following issuance of the Administrative Order by the USEPA, Stepan and the other ordered generator parties undertook to perform the remediation pursuant to the Order, and thereby incurred and paid response costs. (Gladstone Cert., Ex. 14.)

## DISCUSSION

### A. *Summary Judgment Standard*

A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is "genuine" if it is supported by evidence upon which a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if a dispute about it might

---

**2.** The JDG direct defendants named in the Complaint are: Aluminum Shapes, Inc.; Colonial Heights Packaging, Inc.; Continental Holdings, Inc.; Croda Inks Corporation; DAP, Inc.; Scott Paper Company; Sonoco Products Company; Union Carbide Corporation; USG Corporation; and USX Corporation.

affect the outcome of the suit under the governing substantive law. *Id.* In deciding whether a genuine issue of material fact exists, the court must view the facts in the light most favorable to the non-moving party and extend all reasonable inferences to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact, regardless of which party ultimately would have the burden of persuasion at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The non-moving party may not rest upon the mere allegations or denials of its pleadings. *Id.* "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. "When the record is such that it would not support a rational finding that an essential element of the non-moving party's claim or defense exists, summary judgment *must* be entered for the moving party." *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 341 (3d Cir. 1990).

## B. *Elements of Liability Under § 113 of CERCLA*

Section 113 of CERCLA provides that any person may seek contribution from any other person who is liable or potentially liable under § 107(a) of CERCLA. 42 U.S.C. § 9613(f)(1). Section 113 "does not in itself create any new liabilities; rather, it confirms the right of a potentially responsible person under section 107 to obtain contribution from other potentially responsible persons." *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116,

1122 (3d Cir.1997). The purpose of § 113 is to permit a potentially responsible person "to recoup that portion of its expenditures which exceeds its fair share of the overall liability." *Id.*

■ In order to prevail on a motion for summary judgment to establish another potentially responsible person's several liability for contribution under § 113, the potentially responsible person seeking contribution must prove four elements that establish the defendant's liability under § 107:(1) that the property is a "facility"; (2) that a "release" or "threatened release" of a hazardous substance from the property has occurred; (3) that a release or threatened release has caused the claimant to incur "response costs"; and (4) that the defendant falls within one of the four categories of "responsible parties." *United States v. CDMG Realty Co.*, 96 F.3d 706, 712 (3d Cir.1996)(citing *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258–59 (3d Cir.1992)).

## C. *Analysis*

Stepan does not dispute that the Ewan and D'Imperio Sites are "facilities" within the meaning of CERCLA or that a "release" of hazardous substances had occurred at each site. Stepan also does not dispute that the members of the JDG have incurred "response costs" as a result of releases at the Ewan and D'Imperio Sites. Stepan argues, however, that the JDG has not and cannot meet its burden of demonstrating by a preponderance of the evidence that hazardous wastes generated by Stepan were disposed of at the Ewan and D'Imperio Sites, causing the members of the JDG to incur response costs.

The sole element for § 113 contribution liability in dispute in these cross-motions for partial summary judgment is the fourth element noted above, namely, whether Stepan falls within one of the categories of responsible parties under § 107(a)(3), which defines responsible party as:

any person who by contract, agreement, or otherwise arranged for the disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . .

42 U.S.C. § 9607(a)(3). In the context of the present case, then, the JDG must demonstrate that there is no dispute of material fact that:

   (a) Stepan arranged with LDC for disposal of wastes;

   (b) LDC disposed of Stepan's waste at the D'Imperio and Ewan Sites;

   (c) Stepan's waste contained hazardous substances; and

   (d) the D'Imperio and Ewan Sites contain hazardous substances of the type present in Stepan's waste.

As to the first prong, there is no dispute that Stepan arranged with LDC for disposal of 2,669 total waste drums from October 1, 1974 through December 31, 1976. (Gladstone Cert., Ex. 1, pg. 239, RR–16.) A sampling of Stepan/LDC documents demonstrates that LDC removed full drums of waste from Stepan's Fieldsboro facility on numerous occasions throughout the relevant time period. (*See* Gladstone Cert., Ex. 38.)

The principal disagreement centers upon whether there is a material factual dispute which precludes summary judgment as to the second prong—whether LDC disposed of Stepan's waste at the D'Imperio and Ewan Sites. At the contribution trial under § 113, it will thus be the burden of the JDG to prove by a preponderance of the evidence that Stepan's waste was disposed of at these sites. *Alcan,* 964 F.2d at 266; *United States v. Marisol, Inc.,* 725 F.Supp. 833, 840 (M.D.Pa.1989); *O'Neil v. Picillo,* 682 F.Supp. 706, 718 n. 2 (D.R.I.1988), *aff'd,* 883 F.2d 176 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990).

In this summary judgment motion the JDG can prevail only if, giving Stepan the benefit of all inferences, there is no material fact in dispute from which a reasonable factfinder could conclude that Stepan's wastes did not end up at the Ewan and D'Imperio Sites. Further, if from the facts of record it appears that the JDG could not sustain its burden of proof by a preponderance of the evidence, then its motion for summary judgment would be denied and Stepan's cross-motion to determine that it has no § 113 liability would be granted.

█ Although there is ample evidence and strong inferences that LDC disposed of Stepan's hazardous substances at the Ewan and D'Imperio Sites, requiring that Stepan's cross-motion for summary judgment be denied, the court finds that Stepan has placed material facts in dispute that may contradict the JDG's evidence and that cannot be resolved on the JDG's present motion for summary judgment.

Upon review of the voluminous record assembled by the parties for these cross-motions, the court finds, for reasons discussed below, that the JDG has met its burden of coming forward with evidence that hazardous waste generated by Stepan was disposed of at the Ewan and D'Imperio Sites. This evidence consists of deposition testimony and other sworn statements by Jerome Lightman and former LDC employees Earl Emmons, Lexington Ford and James Smith, as well as LDC's discovery responses in this case, as discussed below. The court further finds, however, that material facts are in dispute when Stepan's evidence is considered in the light most favorable to Stepan regarding the existence of Stepan's waste at the landfills.

The JDG has come forward with evidence that LDC disposed of Stepan waste at the Ewan Site. Earl Emmons, a former LDC employee, admitted in a sworn affidavit dated February 27, 1990 that he disposed of Stepan Waste at the Ewan Site. (Gladstone Cert., Ex. 45.) In another statement dated September 22, 1989, sub-

mitted under cover of a November 16, 1989 sworn affidavit, Emmons identified Stepan as a regular customer of LDC, claimed that he dumped many loads of Stepan waste at the Ewan Site, and specifically recalled two loads that he took directly from Stepan's facility to the Ewan Site. (Gladstone Cert., Ex. 46.) More recently, Emmons confirmed his recollection of having disposed of Stepan waste at the Ewan Site in deposition testimony in this case. (Gladstone Cert., Ex. 9, at 149:2 through 150:21; Ex. 44, at 37:5 through 40:18.) Additionally, Jerome Lightman testified during his deposition in this case that LDC "probably" disposed of Stepan waste at all of the sites LDC utilized, including Ewan. (Gladstone Cert., Ex. 11, at 410:3–5.) LDC has admitted in response to the JDG's requests for admissions in this case that it disposed of Stepan waste at Ewan. (Gladstone Cert., Ex. 10, W–1.)

The JDG has also come forward with evidence that LDC disposed of Stepan waste at the D'Imperio Site. James Smith, a former LDC employee, testified that Stepan waste was disposed of at the D'Imperio Site. (Gladstone Cert., Ex. 39, at 85:22 through 86:12.) In fact, Smith recalls a particular incident when Stepan waste was disposed of at the D'Imperio Site and a mushroom-shaped cloud formed in the back of the truck as they poured liquid waste from a drum. (Id. at 20:5 through 22:13; 138:4 through 139:20.) Although Smith testified that he was not present the day the mushroom cloud formed, Lexington Ford, another former LDC employee, recalled the same incident. (Gladstone Cert., Ex. 40, at 246:6–15; 410:11 through 412:7; 457:9–14.) Ford could not recall whether the drum involved in the mushroom-cloud incident came from Stepan. (Gladstone Cert., Ex. 41, at 90:9 through 92:9.) However, Ford did specifically recall dumping Stepan waste at D'Imperio on other occasions. (Gladstone Cert., Ex. 40, at 267:10 through 268:2.) Additionally, Jerome Lightman testified that it was "probable" that Stepan waste, including sulfonic waste, was disposed of at the D'Imperio Site. (Gladstone Cert., Ex.

42, at 698:23 through 699:11.) In so doing, he recanted prior deposition testimony in which he expressed doubt that Stepan waste was disposed of at D'Imperio. (Id. at 702:16 through 712:1.) Lightman corrected his testimony based on his review of document indicating that significantly more loads of waste were removed by LDC from Stepan than he originally recalled, and on his refreshed recollection that a more experienced employee, such as Lexington Ford, would be able to handle Stepan's waste's safely. (Id.) LDC admitted in response to the JDG's requests for admissions in this case that it disposed of Stepan waste at the D'Imperio Site. (Gladstone Cert., Ex. 10, W–2 and W–3.)

In an effort to create a genuine issue of material fact as to whether its waste was disposed of at the Ewan and D'Imperio Sites, Stepan has proffered documents that its wastes were disposed of elsewhere by LDC during the relevant time period, accounting for all drums that LDC allegedly transported from Stepan's facility. The total number of Stepan drums that the JDG alleges were removed from Stepan by LDC during the relevant time period is 2,669. Stepan accounts for these as disposed of elsewhere as follows:

(a) Enterprise Avenue Site in Philadelphia (which was allegedly LDC's primary disposal location during the relevant time period, and regarding which disposals Jerome Lightman was convicted of over 30 counts of bribery for bribes paid to City of Philadelphia employees by LDC to allow unauthorized waste disposal)(see Aronson Cert., Ex. I): *1,264 drums;*

(b) Buzby Brothers Landfill, according to LDC Report to NJDEP (1974)(see Aronson Cert., Ex. J): *874 drums;*

(c) Central Steel Drum Site, according to LDC Report to NJDEP (1975) (see Aronson Cert., Ex. K): *581 drums;*

(d) Pfeiffer Landfill, according to LDC Report to NJDEP (1976)(see Aronson Cert., Ex. I): *945 drums;*

TOTAL: 3,664 drums.

The JDG argues that Stepan's documentary evidence relating to the Enterprise Avenue Superfund Site consist of nothing but accusations by the City of Philadelphia that Stepan waste was disposed of at the Enterprise Avenue Site. Furthermore, the JDG points out that Stepan denied that its waste was disposed of at Enterprise Avenue in its answer to the complaint filed against it by the City of Philadelphia regarding that site. (Bernardo Certification ("Bernardo Cert."), Ex. B.) The JDG also notes that, during discovery in that case, Stepan claimed to have insufficient information to admit or deny the City of Philadelphia's requests for admissions that drums of waste referred to in attached Stepan and LDC documents reflecting the pick-up of drums of waste from Stepan by LDC were disposed of at the Enterprise Avenue Site. (Bernardo Cert., Ex. C, pg. 87, Request Nos. 186–231.) Eventually, Stepan settled with the City of Philadelphia without admitting liability. (Bernardo Cert., Ex. D.)

With respect to the hauler reports LDC submitted to NJDEP reflecting the transport of large quantities of Stepan waste to the Buzby Brothers, Central Steel Drum and Pfeiffer sites, the JDG points out that Jerome Lightman has admitted that he prepared and submitted false reports to the NJDEP regarding the disposal locations utilized by LDC during the relevant time period. (Gladstone Cert., Ex. 10, B–31.)

Nevertheless, the court finds that Stepan's documentary evidence reflecting the disposal of large quantities of Stepan waste at sites other then Ewan and D'Imperio is sufficient to create a genuine issue of material fact. The City of Philadelphia's calculation that 1,264 drums of Stepan waste were disposed of at Enterprise Avenue was based upon an investigative analysis of records of bribe payments correlated with invoices or checks for LDC's pickup of Stepan's waste. Stepan's failure to explain how it has come to have knowledge of the disposal of its hazardous wastes at Enterprise Avenue that it claimed to lack in the Enterprise Avenue litigation or why it now asserts that waste was disposed of at Enterprise Avenue when it denied the City of Philadelphia allegations to that effect in the Enterprise Avenue litigation creates substantial doubt as to whether the Enterprise Avenue documentation will be probative or entitled to any weight at trial. As the party opposing the JDG's motion for summary judgment, however, Stepan is entitled to the inference that the City of Philadelphia's investigative accusations regarding the Enterprise Avenue site are accurate and account for a substantial quantity the Stepan waste handled by LDC during the relevant time period. Similarly, while Jerome Lightman has admitted to submitting fraudulent reports to NJDEP, there is no evidence that the specific documents upon which Stepan relies were fraudulent. Stepan may be hard-pressed to escape that conclusion at trial, but at the present juncture, Stepan is entitled to the inference that the particular reports upon which it relies are accurate and true for the purpose of opposing the JDG's motion for summary judgment. If accurate and true, these reports would rule out another substantial quantity of Stepan's waste from having been disposed of at the Ewan and D'Imperio Sites. Whether these documents, signed by Jerome Lightman, impeach Lightman's testimony that Stepan's waste was disposed of at the D'Imperio Site is a genuine issue of material fact to be determined at trial.

In an effort to corroborate the testimonial and documentary evidence upon which it relies to prove that LDC disposed of Stepan's waste at the Ewan and D'Imperio Sites, the JDG claims that there is evidence that hazardous constituents of Stepan's waste are among the types of substances found at the Ewan and D'Imperio Sites.

Stepan acknowledges that it manufactured surfactants and hydrotropes at is facility in Fieldsboro, New Jersey for use in household products such as detergents, soaps, shampoos and toothpaste during the relevant time period. (Stepan's Local Civ-

il Rule 56.1 Statement, ¶¶ 1–3.) Stepan manufactured surfactants in a continuous sulfonation process, which produces various compounds forming detergents and detergent intermediate products known as sulfonates. (*Id.* at ¶ 4.) Stepan produced xylene sulfonate hydrotropes by reacting xylene with sulfuric acid in a batch manufacturing process, and Stepan may have also produced cumene sulfonate hydrotropes by substituting cumene for xylene in a batch manufacturing process. (*Id.* at ¶¶ 6–7.)

Stepan arranged for LDC to remove three types of drummed waste from its facility: (1) continuous sulfonation process waste; (2) hydrotrope process waste ("xylene still bottoms"); and (3) miscellaneous low-volume wastes. (*Id.* at ¶ 10.) The first category—continuous sulfonation process waste—comprised over 90% of the drummed waste removed by LDC and contained unneutralized lauryl alcohol sulfonic acid, dodecylbenzene sulfonic acid, or linear primary alcohol ethoxolate sulfonic acid and unreacted raw materials and sulfuric acid. (*Id.* at ¶ 11.) The continuous sulfonation process also generated demister and scrubber acid wastes and "drop acids". (*Id.* at ¶ 12.) The xylene still bottom waste accounted for about 7.5% of the drummed waste and included xylene sulfones with some sodium or ammonium xylene sulfonate product. (*Id.* at ¶ 14–15.) The still bottom waste may also have contained xylene and cumene. (*Id.* at ¶¶ 16–17.)

Stepan contends that its pourable continuous sulfonation process waste did not contain any of the hazardous substances identified in either the soil or groundwater at the D'Imperio or Ewan Sites. (*Id.* at ¶ 19.) The JDG, however, has proffered evidence that Stepan's continuous sulfonation process wastes include highly acidic dodecylbenzene sulfonic acid and sodium dodecylbenzene sulfonate, which are listed as hazardous substances under 40 C.F.R. § 302.4, and that compounds "consistent with" these substances were "tentatively identified" at the D'Imperio Site. (Gladstone Cert., Ex. 18.)

The JDG alleges that nickel and chromium at the sites came from Stepan's stainless steel tubing in the hydrotrope batch process (Gladstone Cert., Ex. 19., at 34:8 through 36:2), and that both chromium and nickel were identified in waste from the hydrotropic batch process. (Gladstone Cert., Ex. 21, Reports of Suburban Laboratories Inc. (May 11, 1983) and Princeton Testing Laboratory, Inc. (October 4, 1988)). Similarly, the xylene and cumene and methanol are all CERCLA hazardous substances under 40 C.F.R. § 302.4, and Stepan's xylene feedstocks also contained benzene and ethylbenzene (Gladstone Cert., Ex. 28; Ex. 20, at 141:14–18), which are also hazardous substances under 40 C.F.R. § 302.4. Xylene is present at the Ewan Site and is a remedial objective there (Gladstone Cert., Ex. 27, at pg. 2 of "ROD" Ex. A), as are phenol and cyanide, which were also reported as contaminants in Stepan's batch process hydrotrope waste. (Gladstone Cert. Ex. 21, Suburban Laboratories report.)

At D'Imperio, benzene, ethylbenzene, phenol and chromium are all chemicals to be redressed in the Groundwater Performance Standards. (Gladstone, Ex. 29, "ROD" Att. IV.) The Ewan Site Groundwater Remedial Objectives include goals for benzene, chromium, cyanide, ethylbenzene, nickels, phenols and xylenes. (Gladstone Cert., Ex. 27, "ROD" at Ex. A.) All of these substances, then, are the same type of chemicals present in the Stepan wastes that were given to LDC for disposal.

In response, Stepan argues that the xylene, benzene, ethylbenzene, phenol and cyanide at the sites were more likely contributed in large volumes of identified wastes of members of the JDG. (*See* Aronson Cert., Ex. B; Gladstone Cert., Exs. 22 and 25.) Stepan admits that chromium was an impurity in products from the continuous sulfonation process, but points to large volumes of chromic acid contributed by members of the JDG as the source of the chromium. (Aronson Cert., Ex. B.)

The JDG's confirmatory evidence, though impressive, is thus genuinely disputed by Stepan's evidence that these hazardous substances (given all reasonable favorable inferences to Stepan as the party opposing summary judgment) could be found to be from other generators of those substances, if Stepan's proofs that its wastes all went elsewhere are also believed, as discussed above. It may be difficult indeed for Stepan to explain at trial how LDC somehow directed Stepan's wastes to the "documented sites" at Enterprise Avenue, Buzby, Central Drum and Pfeiffer while disposing of the wastes of the JDG members at Ewan and D'Imperio, but since Stepan's counter-evidence raises slightly more than a "metaphysical doubt," summary judgment against Stepan must be denied.

Finally, Stepan overstates the JDG's burden in a contribution action under § 113 of CERCLA when it argues that the JDG has failed to establish that its members incurred response costs directly attributable to the disposal of Stepan's waste at the Ewan and D'Imperio Sites. To establish another potentially responsible person's liability for contribution under § 113, the claimant need only prove by a preponderance of the evidence that the defendant is liable under § 107 of CERCLA. As the Third Circuit has stated:

> [Section 107] does not ... require the plaintiff to prove that the generator's hazardous substances themselves caused the release or caused the incurrence of response costs; rather, it requires the plaintiff to prove that the release or threatened release caused the incurrence of response costs, and that the defendant is a generator of hazardous substances at the facility.

*Alcan,* 964 F.2d 252, 264 (3d Cir.1992). The court will determine the appropriate allocation of response costs among liable parties at trial, according to such equitable factors as the court deems appropriate. *See United States v. Kramer,* 953 F.Supp. 592, 597 (D.N.J.1997).

## CONCLUSION

For these reasons, the court is constrained to deny without prejudice the JDG's motion for partial summary judgment for contribution against Stepan, which sought to declare Stepan severally liable to the JDG for past and future response costs at the Ewan and D'Imperio Sites under § 113 of CERCLA, and the court denies Stepan's cross-motion for summary judgment dismissing the JDG's contribution claim under § 113 of CERCLA.