The **UNITED STATES** of
**America, Plaintiff,**

v.

**SPAULDING COMPOSITES
COMPANY, INC.,**
**Defendant.**

**Civil Action No. 94–5451 (DMC).**

United States District Court,
D. New Jersey.

May 10, 2002.

Mark A. Gallagher, U.S. Department of Justice, Environment & Natural Resources Div., Environmental Enforcement Section, Washington, DC, for the USA—Dept. of Justice.

Virginia Curry, New York City, for the USA—EPA.

Daniel P. Carter, Buckley King & Bluso, Cleveland, OH, for Spaulding Composites Company, Inc.

John J. Dugan, Wolf Block Schorr & Solis–Cohen, LLP, Cherry Hill, NJ, Local counsel for Spaulding Composites Company, Inc.

## OPINION

CAVANAUGH, District Judge.

This matter comes before the Court on motion by Plaintiff The United States of America[1], against Defendant Spaulding Composites Company, Inc. ("Spaulding") seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to the divisibility of costs and harm at the Caldwell Superfund Site in Fairfield, New Jersey. Oral argument was heard on this motion on May 3, 2002. After painstakingly reviewing the detailed submissions both in support of and in opposition to the present motion, this Court holds that the Government's motion for summary judgment shall be **granted.**

## BACKGROUND

### Spaulding's Lead Waste

Defendant Spaulding Composites, Inc. operated a manufacturing facility in Clifton, New Jersey that produced mica products and a slurry waste by-product containing lead. Between approximately 1958 and 1973, Caldwell Trucking Company transported lead-containing wastes generated by Spaulding and its predecessor-in-interest, Mycalex Corporation, and deposited them at the Caldwell Trucking Superfund Site (the "Caldwell Site"). Spaulding's waste was a "unique and well-defined by-product that contained inorganic materials, primarily insoluble lead." *See* Steven P. Goldberg Expert Report, dated 8/31/00. Counsel for Spaulding further described the waste product as a lead frit[2] encapsulated in glass. Oral Arg. Tr. at 14:23–25; 15:1–5. Notably, Spaulding's waste contained no volatile organic compounds ("VOC"). In fact, Spaulding asserts that it was incapable of producing VOCs and thus, it should not be responsible for costs related to remediating VOC contamination.

### The Nature and Type of Costs Sought in the Present Motion

The response costs incurred by the EPA can be categorized as (1) remedial, and (2)

---

1. The United States of America will be generally referred to in this Opinion as the Government. However, because the Government's interests in this case are specifically represented by the Environmental Protection Agency ("EPA") and the Department of Justice ("DOJ"), this Opinion will refer specifically to the EPA or the DOJ whenever appropriate.

2. The term "frit" refers to fused or partially fused materials used in making glass, porcelain, glazes, or enamels. THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, (4th ed.2000), *available at* http://www.dictionary.com/search?q=frit.

general and enforcement costs. The contamination at the Caldwell Site was divided into two units, the first addressing soil and sludge contamination (Operable Unit 1 or OU1) and the second addressing groundwater contamination (Operable Unit 2 or OU2). *See* May 3, 2002 Oral Argument Transcript ("Oral Arg. Tr.") at 5:3–6. Since Spaulding is incapable of producing VOCs, and the OU2 remedy entirely consists of VOC groundwater cleanup, the Government opted to not attempt to recover OU2 costs from Spaulding. *See* Oral Arg. Tr. at 8:16–19; 14:6–11. However, but for one specific contract, the Government argues that Spaulding must pay for the entire OU1 remedy.

The OU1 remedy required some of the following actions:

- Excavation and off-site disposal of California List Waste materials.

- Excavation, off-site treatment, and disposal of soils with VOC concentrations.

- In-situ stabilization of contaminated soils.

- Placement of two feet of clean soil over the solidified mass.

While the Caldwell Trucking PRP Group performed the OU1 remedy pursuant to a consent decree, the EPA performed substantial OU1 work at the Caldwell Site, such as:

- Performance of a remedial investigation and feasibility study to assess the contamination at the Caldwell Site.

- Analysis of samples derived from the above-mentioned remedial investigation and feasibility through the Contract Laboratory Program.

- Performance of remedial design for the OU1 remedy.

- Review of EPA's OU1 remedial documents by the State of New Jersey.

Through this motion, the EPA seeks to recover its response costs in performing remedial efforts on OU1. *See* Declaration of Jo–Ann Velez ("Velez Decl.") ¶ 23. The EPA has carefully crafted it's motion to seek only those costs that they believe are incapable of division. In sum, the Government seeks **$6,766,744.22**. Supplemental Certification of Mark A. Gallagher in Support of Motion for Summary Judgment ("Gallagher Supp. Cert."), ¶¶ 9–10; Velez Decl., ¶¶ 9; Oral Arg. Tr. at 12:24–25, 13:1–7, 18:11–16.

The EPA also claims to have contracted with private entities to perform work addressing general and enforcement matters at the Site, rather than soil (OU1) or groundwater (OU2) contamination specifically. These independent contractors did the following work for the EPA:

- Performance of searches for potentially responsible parties.

- Assessment of the Site's overall health risks.

- Compilation and maintenance of EPA's Administrative Records for the Site.

- Compilation and maintenance of EPA's records regarding the Site in EPA's records center.

- Performance of miscellaneous tasks such as publishing public notices, duplicating photographs, obtaining permits, etc.

The Government also seeks to recover **$223,621.99** in general enforcement costs incurred by the EPA and **$373,745.49** in costs incurred by the Department of Justice in enforcing aspects of this litigation and Defendant Spaulding's bankruptcy proceeding. *See* Oral Arg. Tr. at 8:20–25.

Spaulding responds that the costs in this matter are divisible because their waste stream contained no VOCs and could not promote the further degradation of other

portions of the Caldwell Site. Spaulding's experts assert that the waste is incapable of reacting or combining with other forms of waste and thus, Spaulding suggests that the costs incurred in remediating its isolated and independent contribution to the Caldwell Site's contamination can easily be divided and separated from the damage due to other contaminants.

### The January 22, 1997 Holding

In January of 1997, District Court Judge William G. Bassler found Spaulding liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) for "at least some" of the costs incurred by the EPA for cleaning the Caldwell Site where Spaulding's waste was discovered. Judge Bassler allowed Spaulding the "opportunity to develop a factual record in support of its contention that the harm to the Site is divisible." *U.S. v. Spaulding Composites Co.*, No. 94–5451 (D.N.J. Jan.22, 1997) (order granting summary judgment in part). *Id.* According to the Government, only two issues remained after the January 1997 Opinion:

1. Whether Spaulding can demonstrate that any portion of the United States' costs are divisible and should be apportioned to another party?

2. What is the amount of the United States response costs?

### A Summation of the Government's Costs

As mentioned during oral argument, the costs in this matter are a "moving target" and as a result, somewhat difficult to pinpoint. *See* Oral Arg. Tr. at 12:9–13. This flux is due to several factors. First, since the filing of this motion, additional remedial and response costs have been incurred. Supplemental Declaration of Richard J. Robinson, ¶¶ 2–4; [Supplemental] Declaration of Virginia A. Curry, ¶¶ 2–4; Gallagher Supp. Cert., ¶ 3. Second, pre-judgment interest has continued

to accrue which is recoverable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). *See* Gallagher Supp. Cert., ¶ 5; Supplemental Declaration of Anne Macaluso, ¶¶ 2–8. Furthermore, the EPA has received reimbursements for some of its costs during the pendency of this motion. Gallagher Supp. Cert., ¶¶ 3, 7; Supplemental Declaration of Jo Ann Velez ("Velez Supp. Dec."), ¶ 5–7. Particularly, on December 21, 2001, the EPA received a payment of $50,000 under the terms of a Consent Decree in a matter entitled *U.S. v. Baureis Realty et al.*, 95–2732 (D.N.J.), a matter also before this Court. Velez Supp. Dec., ¶ 5. A subsequent payment in that same matter was made on February 11, 2002 in the amount of 1.6 million dollars. *Id.* Furthermore, the settling parties in *U.S. v. Carborundum Corp. et al.*, No. 94–1484 (D.N.J.), have made five payments in the amount of $487,217.05. Velez Supp. Dec., ¶ 6. According to the EPA, 54.34 percent of the EPA's costs can be attributed to OU1 and general enforcement costs, so the EPA subtracted 54.34% of these reimbursements (totaling $2,137,217.05), or $1,161,363.74, from its total cost recovery request. *See id.* These collected reimbursements have also resulted in a reduction of the interest sought by the Government in the amount of $64,934.73. Therefore, the amount to be subtracted from the Government's total cost request is $1,226,298.48 ($1,161,363.74 + $64,934.73).

As demonstrated above, the costs in this matter have frequently changed. However, as of May 3, 2002, the following total costs were sought by the Government:

| | | |
|---|---|---|
| OU1 Contract Costs sought as of the filing of this motion | = | $1,451,563.69 |
| Interest on OU1 costs sought | = | $ 824,906.61 |
| New OU1 Contract Costs since the filing of this motion | = | $ 10,141.75 |
| Interest on new OU1 costs | = | 390.24 |
| 90% of an Army Corps of Engineers Contract plus associated indirect costs | = | $2,338,393.12 |

| Interest | = | $1,322,716.10 |
|---|---|---|
| Certain Allocated Costs (attributable to OU1) | = | $ 954,021.66 |
| Interest | = | $ 462,460.97 |
| General Enforcement Costs (EPA) | = | $ 159,759.89 |
| Interest | = | $ 63,862.10 |
| New General Enforcement Costs (EPA) | = | $ 29,566.68 |
| Interest | = | $ 1,514.40 |
| General Enforcement Costs (DOJ) | = | $ 315,745.37 |
| Interest | = | $ 58,000.12 |
| | | |
| SUBTOTAL ========> | = | $7,993,042.70 |
| | | |
| MINUS ALLOCATEDC OLLECTIONS from consent decrees in related matters | = | $1,226,298.48 |
| | | |
| TOTAL PRINCIPAL & INTEREST MINUS COLLECTIONS | = | $6,766,744.22 |

These changes in the Government's costs since the filing of the motion have resulted in a net decrease in the actual amount originally sought to be recovered. Gallagher Supp. Cert., ¶ 8.

The OU1 Contract Costs sought by the EPA as of the filing of this motion totaled $1,451,563.69. These costs constitute payments to contractors that worked entirely on the OU1 cleanup, as identified by Mr. Robinson–EPA Remedial Project Manager at the Caldwell Site, plus the indirect costs associated with those payments (such as non-site specific costs associated with the EPA's operation of the Superfund Program). These OU1 direct and contract costs, not including prejudgment interest, are detailed in the following chart. *See also* [Reply] Declaration of Jo Ann Velez ("Velez Reply Decl."), ¶¶ 14–19; Attachment 2.

### OU1 Contract Costs

| EPA Indirect Costs | = | $12,387.31 |
|---|---|---|
| Emergency Removal Cleanup Contract—O.H. Materials Corp. (Contract # 68–01–7445) | = | $39,988.26 |
| Interagency Agreement with Army Corps of Engineers (Contract # DW96116401) | = | $14,235.57 |
| Interagency Agreement with Army Corps of Engineers (Contract # DW961250001) | = | $21,142.14 |
| Remedial Contact with NUS Corp. (Contract # 68–01–6699) | = | $1,347,805.09 |
| Technical Assistance Team Contract with Roy F. Weston, Inc. (Contract # 68–01–7367) | = | $13,727.97 |

| Technical Assistance Team Contract with Roy F. Weston, Inc. (Contract # 68–W0–0036) | = | $2,277.35 |
|---|---|---|
| | | |
| OU1 Contract Costs Subtotal | = | **$1,451,563.69** |

The contract costs arising out of a particular contract with the Army Corps of Engineers related to the OU1 remedy is **$2,338,393.12**. This figure represents ninety percent (90%) of the work performed under the EPA's Inter–Agency Agreement with the Army Corps of Engineers and indirect costs. This OU1 contract cost, not including prejudgment interest, is detailed in the following chart. *See also* Velez Reply Decl., ¶¶ 14–19; Attachment 4.

### Army Corps of Engineers Contract

| Interagency Agreement (IAG) with Army Corps of Engineers (Contact # DW96240601) | = | $2,269,705.88 |
|---|---|---|
| EPA Indirect Costs | = | $328,508.70 |
| Subtotal | = | $2,598,214.58 |
| | | |
| 90% of the Subtotal (indicating that 90% of this cost is attributable to OU1) | = | $2,338,393.12 |

The total costs arising out of certain allocated costs are **$954,021.66**. These costs relate to the OU1 remedy-related portion of EPA's payroll and travel costs, contract lab program costs, State Cooperative Agreement costs, plus the indirect costs associated with those expenditures (such as the payroll and travel costs incurred by EPA personnel). These OU1 costs, not including prejudgment interest, are detailed in the following chart. *See also* Velez Reply Decl., ¶¶ 14–19; Attachment 6.

### Certain Allocated Costs

| Regional Payroll Costs | = | $607,431.54 |
|---|---|---|
| Headquarters Payroll Costs | = | $14,889.64 |
| EPA Indirect Costs | = | $577,864.48 |
| Regional Travel Costs | = | $4,097.47 |
| Headquarters Travel Costs | = | $2560.78 |
| State Cooperative Agreement with NJ DEP (Contract # 264788) | = | $62,222.00 |
| Contract Lab Program Financial Cost Summary | = | $486,580.72 |
| | | |
| Subtotal | = | $1,755,646.63 |
| | | |
| 54.34% of Subtotal (accounting for rounded figures) | = | **$954,021.66** |

The above OU1 contract and allocated costs amount to **$4,754,860.20** in total. *See* Velez Reply Decl., ¶¶ 14–19; Attachment 2.

In addition, the EPA's general and enforcement costs are detailed in the following chart. See Velez Reply Decl., ¶ 20; Attachments 7–8.

### EPA General Enforcement Costs

| | | |
|---|---|---|
| EPA Indirect Costs (related to the Superfund Program in general) | = | $24,903.42 |
| Agency for Toxic Substances & Disease Reg. (ATSDR Costs) | = | $31,260.46 |
| Enforcement Support Serv. Contract TRC Environmental Corp. (Contract # 68–W4–0020) | = | $34,554.52 |
| Environmental Services Assistance Teams—Lockheed Engineering & Sciences Co. (Contract # 68–D1–0158) | = | $1,177.34 |
| Integrated Support Systems, Inc. (Contract # 68–R2–9904) | = | $241.57 |
| Technical Enforcement Support Contracts–Alliance/GCA (Contract # 68–01–6769) | = | $276.90 |
| Technical Enforcement Support Contracts—CDM Federal Programs Corporation (Contract # 68–W9–0002) | = | $39,827.08 |
| Miscellaneous Costs | = | $27,518.60 |
| **TOTAL** | = | $159,759.89 |

Moreover, the general and enforcement costs of the Department of Justice are described by William M. Kime, CPA as $315,745.37 in costs and $58,000.12 in interest, totaling **$373,745.49**. The Department of Justice general/enforcement costs were compiled by William M. Kime, CPA of the public accounting firm of Rubino & McGeehin, who is under contract with the Dept. of Justice Environment and Natural Resources Division. *See* Declaration of William M. Kime, CPA ("Kime Decl."), ¶ 1–3. In his declaration, Mr. Kime explains that the DOJ incurs three types of costs; (1) Direct Labor Costs, (2) Other Direct Costs, and (3) Indirect Costs. *See* Kime Decl., ¶ 6.

Direct Labor Costs are the actual hours expended by attorneys and paralegals. *Id.* Other Direct Costs are expenses specifically connected to this case such as travel costs, fees for experts and special masters, costs of transcripts and other litigation support expenses. *Id.* Indirect Costs include secretarial and accounting support, record keeping costs, office space and supplies and fringe benefits. *Id.* Indirect costs are attributed to a particular case by assessing the percentage of direct labor hours spent on a particular case (such as this one) in comparison to the total amount of direct labor hours worked by DOJ staff in a fiscal year. This comparison yields a percentage of time (for example 5% out of 100% of DOJ direct labor hours were dedicated to a particular case). Indirect costs are assessed using the same percentage (using the same example, 5% of the DOJ's indirect costs would be attributed to this case because 5% of the DOJ's direct labor hours were dedicated to this case). *Id.*

According to Mr. Kime, these three categories of costs yield a figure of $315,745.37. Kime Decl., ¶ 8; Exhibit A (detailing the exact costs by year and by category). Through 9/30/2000, interest on this figure is $58,000.12. Kime Dec., ¶ 9(a-i). The Government has not updated the request for costs or interest with regard to this cost.

## DISCUSSION

### I. Summary Judgment.

Summary judgment eliminates unfounded claims without recourse to a costly and lengthy trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c). The burden of showing that no genuine

issue of material fact exists rests initially on the moving party. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A litigant may discharge this burden by exposing "the absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. However, this effort requires more than "simply show[ing] that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In evaluating a summary judgment motion a court must view all evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587, 106 S.Ct. 1348; *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir.1999) (*citing Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir.1998)); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). The Court's role is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue of fact for trial." *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Abraham*, 183 F.3d at 287.

Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law determines which facts are material. *Id.* at 248, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* No issue for trial exists unless the non-moving party can demonstrate sufficient evidence favoring it, such that a reasonable jury could return a verdict in that party's favor. *See id.* at 249, 106 S.Ct. 2505.

## II. Divisibility of Harm under CERCLA.

Under Section 107 of Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607, the United States may recover any costs incurred in remediating contaminated sites. Specifically, CERCLA requires that all liable parties pay "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). To recover costs, the Government must establish that Spaulding falls into one of the responsible party categories; that Spaulding disposed hazardous waste at the Caldwell Site; that Spaulding's waste disposal caused the release or threat of such release of hazardous substances into the environment; and that the United States incurred response costs as a result. *See* 42 U.S.C. § 9607(a); *New Jersey Turnpike Authority v. PPG Industries Inc.*, 197 F.3d 96, 103–04 (3d Cir.1999); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258–59 (3d Cir. 1992). Judge William G. Bassler, in an Opinion dated January 22, 1997 found Spaulding liable for costs to the United States, but permitted further discovery on the issue of cost divisibility.

Under CERCLA, a joint and severally liable tortfeasor, like Spaulding, can diminish the extent of its liability for costs under the divisibility of harm rule. *See Alcan*, 964 F.2d at 268. The Third Circuit in *Alcan* adopted this rule from section 433A of the Restatement (Second) of Torts (1965), which provides that:

(1) Damages for harm are to be apportioned among two of more causes where

(a) there are distinct harms, or

(b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two of more causes.

This provision requires this Court to address two questions. First, is the contamination at the Site somehow divisible? Second, are the response costs incurred by the United States "capable of some reasonable apportionment[?]" *Alcan*, 964 F.2d 252, 270–71 (3d Cir.1992). The Third Circuit opined that "common law principles of joint and several liability provide[d] the only means [to] ... infuse fairness into the [CERCLA] statutory scheme without distorting its plain meaning." *Alcan*, 964 F.2d at 268. The burden of establishing the divisibility of damages is on the tortfeasor. *Alcan*, 964 F.2d at 269. This burden is substantial. *See Alcan*, 964 F.2d at 271; *O'Neil v. Picillo*, 883 F.2d 176, 183 (1st Cir.1989); *U.S. v. Agway, Inc.*, 2002 WL 485039, * 2 (N.D.N.Y. March 28, 2002).

Spaulding argues that divisibility is appropriate in this case because: (1) Spaulding's waste is unique, well-defined and insoluble; (2) Spaulding's waste contained no VOCs, only lead; and (3) Spaulding's experts demonstrate that Spaulding's waste was incapable of acting or reacting synergistically with other wastes that could exacerbate any contamination at the Site.

The Government argues that Spaulding cannot show divisibility in this case for four reasons. First, the "primary goal" of the OU1 remedy was "remediation of the soil's lead contamination." Expert Report of William J. Hengemihle on divisibility of harm and Apportionment of Government Response Costs, dated August 31, 2000, ("Hengemihle Rpt."), ¶ 16. Second, lead contamination was found in substantial quantities throughout the Caldwell Site,

not merely in discrete or isolated parts of the soil. Declaration of Richard J. Robinson ("Robinson Decl."), ¶ 17. Third, lead contamination by itself, created need for special remedial efforts, unrelated to the efforts required to remove VOCs. Robinson Decl., ¶ 14. Fourth, the soil that was contaminated with both lead and VOCs also "created the need for special and more expensive measures," that neither "would have required on its own." Robinson Decl., ¶ 13. The Government argues that due to these factors, the harm caused by the soil contamination is not divisible and as a result, the Government is entitled to all of its remedial costs. In addition, the Government claims to be entitled to general and enforcement costs that are arguably not capable of apportionment because such costs are not attributable to any remedy specifically, but are merely investigative in nature.

Spaulding responds that these requested costs are capable of reasonable apportionment by utilizing a percentage method, similar to the Government's method of apportioning its indirect costs related to independent contractors. The Government challenges this assertion because indirect costs, such as EPA payroll and contract laboratory program costs are directly related to either OU1 or OU2, while general/enforcement costs, such as PRP searches, maintenance of an administrative record, and enforcement actions all relate to the Site as a whole as opposed to OU1 or OU2 specifically. Accordingly, the Government argues that Spaulding has not met its burden of demonstrating divisibility.

■ The Court recognizes that Spaulding's divisibility arguments possess some merit. However, the Government has withdrawn all costs that appear to be potentially divisible. *See* Velez Reply Decl, ¶ 23. The remaining costs challenged by

Spaulding all address OU1 response costs, which were focused on the investigation, design and remediation of lead waste produced by Spaulding. Having reviewed the entire record carefully, this Court is not convinced that Spaulding has met its burden of proving that the contamination at the Caldwell Site is divisible. First, Spaulding's arguments do not point to any specific costs that are arguably divisible, but for the costs that the Government has opted not to recover through this motion, such as the costs for the OU2 remedy or the costs arising out of certain contracts related to OU2. Instead, Spaulding makes generalized arguments citing how Spaulding's waste stream is unique and non-volatile. These assertions are not sufficient to show the divisibility of the Government's sought after costs. The Government's response costs for OU1 at the Caldwell Site were primarily directed toward remediating the soil's lead contamination. *See* Hengemihle Rpt., ¶ 16. Furthermore, the mere presence of Spaulding's slurry lead waste, found both by itself and commingled amongst other types of waste at the Caldwell Site, created the need for special remedial measures unrelated to the removal of VOCs. As a result, this Court finds that the costs related to OU1 direct, contract, allocated and enforcement expenditures are not sufficiently distinct to permit reasonable apportionment of the harm at the Caldwell Site. *See Alcan*, 964 F.2d at 270–71. In sum, the Government seeks to recover response costs in the amount of $7,993,042.70 minus $1,226,298.48 in reimbursements that have been collected during the pendency of this motion. In total, the Government seeks to recover **$6,766,-744.22**. This Court finds that the Government is entitled to judgment as a matter of law as to this amount. The Government's motion for summary judgment on the issue of divisibility of harm is **granted** because there are no genuine issues of material fact regarding a reasonable basis for apportionment of liability.

## CONCLUSION

For the foregoing reasons, the Government's motion is granted. An Order accompanies this Opinion.

## ORDER

This matter having come before the Court on Plaintiff, The United States of America's motion for summary judgment as to the divisibility of costs at the Caldwell Superfund Site, and this Court having heard oral argument and having reviewed the initial and supplemental submissions provided by the parties, and this Court having reviewed the applicable law as evidenced by the herein Opinion, and for good cause shown,

IT IS ON THIS TENTH DAY OF MAY 2002,

**ORDERED** that the United States' motion for summary judgment is **granted;** and it is further

**ORDERED** that Defendant Spaulding Composites Company, Inc. shall be and hereby is jointly and severally liable for the costs enumerated in this Court's Opinion filed herein, which include all of the EPA's unrecovered response costs at the Caldwell Superfund Site regarding OU1 direct costs, contract costs, certain allocated costs as to OU1, general enforcement costs, plus prejudgment interest and all of the Department of Justice's general and enforcement costs, including interest, which amount to a total of **$6,766,744.22**, and it is further

**ORDERED** that this matter is hereby **closed.**